## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **CONSOLIDATED HORTICULTURE** | ) | |
| **GROUP LLC** *et al.*,[1] | ) | **Case No. 10-13308 (___)** |
| | ) | |
| **Debtors.** | ) | **Joint Administration Requested** |
| | ) | |

## DECLARATION OF STEPHEN THIGPEN, PRESIDENT
## AND CHIEF EXECUTIVE OFFICER OF THE DEBTORS,
## IN SUPPORT OF FIRST DAY MOTIONS

I, Stephen Thigpen, being duly sworn, state the following under penalty of perjury:

1.　　I am the President and Chief Executive Officer of Consolidated Horticulture Group LLC ("Consolidated"), New Hines Parent Company, LLC ("Hines Parent"), and Hines Nurseries LLC ("Hines Nurseries"), each a limited liability company organized under the laws of the State of Delaware and each a debtor and debtor in possession (collectively, the "Debtors"). In this capacity, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs and books and records. I have substantial experience in agribusiness and in the horticultural growing business.

2.　　On the date hereof (the "Petition Date"), each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). The Debtors are operating their businesses and managing their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). No request for the appointment of a trustee or examiner has been made in

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of each Debtors' federal tax identification numbers are:  Consolidated Horticulture Group LLC (2698); New Hines Parent Company LLC (9355); and Hines Nurseries LLC (2567)  The location of the Debtors' headquarters and the service address for the Debtors is:  12621 Jeffrey Road,  Irvine, California 92620.

{N2211347.3}

these Chapter 11 Cases, and no official committees have been appointed. Concurrently with the filing of the Chapter 11 Cases, the Debtors have sought joint administration of these Chapter 11 Cases.

3. Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents and information supplied to me by other members of the Debtors' management and the Debtors' advisors in the ordinary course of my duties. I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## PART I.

## PRELIMINARY STATEMENT

4. The Debtors are one of the largest commercial nursery operations in North America, producing one of the broadest assortments of ornamental shrubs, color plants and container-grown plants in the industry. The Debtors sell their goods to more than 800 retail and commercial customers, representing more than 3,400 outlets throughout the United States, including premium local and regional garden centers, as well as leading national home centers and retailers, such as The Home Depot, Lowe's and Wal-Mart.

5. The Debtors have experienced significantly greater than expected declines in revenue. The Debtors' decline in revenue stems primarily from, among other things: (a) continued weak consumer demand for products in the Debtors' industry; (b) anemic homebuilding activity; (c) continued pricing pressure from certain of the Debtors' largest customers;(d) loss of revenues from business strategy changes from one of the Debtors' largest customers; and (e) inventory imbalances that lead to shortages of critical crops. Additionally, because the Debtors' business is

tied to home gardening and landscaping, the continued recession and decline in residential housing market in general has impacted their sales.

6.     To enable the Debtors to minimize the adverse effects of the commencement of these Chapter 11 Cases on their businesses and avoid immediate and irreparable harm, the Debtors have requested various types of relief in their "first day" motions and applications (each, a "First Day Motion"). The First Day Motions seek relief intended to allow the Debtors to effectively transition into chapter 11 and minimize disruption of the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates. I am familiar with the contents of each First Day Motion (including the exhibits thereto), and I believe that the relief sought in each First Day Motion:  (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value; (b) constitutes a critical element to achieving a successful outcome to in these Chapter 11 Cases and preserving the value of the Debtors' assets; and (c) best serves the interests of the Debtors' estates and creditors.

7.     Part II of this Declaration describes the Debtors' business, their capital structure and the circumstances surrounding the commencement of these Chapter 11 Cases. Part III sets forth the relevant facts in support of each of the First Day Motions.

## PART II.

## OVERVIEW OF THE DEBTORS' BUSINESS OPERATIONS

### A.     Description of the Debtors' Businesses

8.     Consolidated Horticulture produces and distributes horticultural products through its direct and indirect subsidiaries, Hines Parent and Hines Nurseries.

9.     As of the Petition Date, the Debtors employed approximately 825 full-time and 75 part-time employees, approximately 700 of whom are compensated on an hourly basis and 200 of whom are compensated on salaried basis. The Debtors' employee base fluctuates seasonally from

a low of approximately 900 to a high of approximately 1,200 employees (excluding Temporary Workers, as hereinafter defined) during the activity-intensive preparation and selling season from February to June. None of the Debtors' employees are represented by labor unions. Hourly, salaried and contract labor comprise nearly 41% of the Debtors' production costs year to date.

10. The Debtors produce approximately 5,100 varieties of ornamental shrubs, color plants, and container-grown plants grown primarily for outdoor use, most of which are under the Hines Nurseries ™ trade name. The Debtors operate eight nurseries located in Arizona, California, Oregon and Texas. The Debtors grow different product varieties at several of their nurseries. The Debtors emphasize certain product categories at particular nurseries depending on the growing climate conducive to a particular product and on regional demand.

11. In 2009, the Debtors recorded net sales of approximately $123.5 million.[2] In 2009, the Debtors reported approximately $173.8 million in total assets, at book value, and approximately $64.4 million in total liabilities, including secured obligations under the Debtors' prepetition secured credit facilities, as more fully detailed herein below (collectively the "Prepetition Credit Facilities").

12. Through the second quarter of 2010, the Debtors recorded net sales of approximately $69.7 million. In addition, at the end of the second quarter of 2010, the Debtors reported approximately $179.3 million in total assets and approximately $86.7 million in total liabilities, including secured obligations under the Debtors' Prepetition Credit Facilities.[3]

13. As of the Petition Date, the Debtor's obligations under its Prepetition Credit Facilities, the only secured obligations of the Debtors, total approximately $70.4 million. In

---

[2] The Debtors were formed in 2009, when it purchased all or substantially all the assets of Hines Nurseries, Inc. from the 2008 Chapter 11 Cases, as described in paragraphs 23 through 26 of this Declaration. Therefore, the Debtors do not have performance history prior to 2009.

[3] The Prepetition Credit Facilities are discussed more fully in this Declaration at paragraphs 32 through 37.

addition, the Debtors owe the following approximate amounts (exclusive of employee-related liabilities and benefits): $8.7 million in trade payables as of September 30, 2010 (billed and unbilled); $400,000 accrued rebates as of October 3, 2010; $70,000 in accrued merchandising fees as of October 3, 2010, and $90,000 in accrued royalties, as of October 3, 2010.

## B.    Product Overview and Production

14.    The Debtors produce approximately 5,100 varieties of ornamental shrubs, color plants, and container-grown plants as noted above. Production of the Debtors' products requires raw materials consisting of, among other things, chemicals and fertilizers, soil, containers, plugs and liners. Plants (other than annual bedding plants) are produced by propagating young plants called "liners" using cuttings from mature plants. Using propagation techniques for each specific crop with respect to growing media, hormonal stimulation and growing conditions, these cuttings are cultivated into viable liners and are then transplanted into larger containers. These plants are tended to in the Debtors' nurseries for six to twenty four months until they reach certain specified sizes and levels of maturity, according to market demand, and are sold at different price points depending on their size and levels of maturity. During the growing stages, plants are typically pruned by mechanized pruning machines that are designed for specific plant categories and watered and fertilized by integrated irrigation and fertilization systems, which are closely monitored and regulated to ensure consistency and quality of the plant products. The Debtors' water and fertilizer systems are designed to minimize the costs of these elements and maximize water conservation. Each of the Debtors' facilities has infrastructure and procedures in place to protect growing stock from most frost, snow and freezing conditions.

15.    To produce annual bedding plants, the Debtors either buy and germinate seeds to produce small plants, called "plugs," or purchase plugs from specialized plug producers. The plugs are then transplanted to bedding packs, hanging baskets and containers of various sizes.

The growth cycle of color plants is typically less than one year, with many color plants having a growing season as short as eight to sixteen weeks, allowing certain of the Debtors' nurseries to produce approximately three to four inventory turns per year. As with ornamental plants, the Debtors apply controlled watering and fertilizing to ensure high quality.

## C. Corporate History and Structure

16. Each of the Debtors is a Delaware limited liability company, and each was formed in 2008. Consolidated Horticulture's members are BD CHG Holdings LLC and BD CHG Holdings II LLC, each of which is an affiliate of Black Diamond Commercial Finance, L.L.C.

17. I am a manager on the board of managers of an entity owned by certain affiliates of Black Diamond Commercial Finance, L.L.C., and receive compensation for such services from such entity. In addition, I am a party to an employment agreement with Hines Nurseries (the "Employment Agreement") and a related agreement (the "Related Agreement") with affiliates of Black Diamond Commercial Finance, L.L.C. Pursuant to the Employment Agreement, under certain circumstances, I may be offered a position with Black Diamond Capital Management, L.L.C., or one of its affiliates if I cease to be employed by Hines Nurseries as Chief Executive Officer. In addition, pursuant to the Related Agreement, BD CHG Holdings LLC, and BDCM Opportunity Fund II, L.P., in certain circumstances, have agreed to guarantee payment of certain aspects of the compensation and benefits I receive from Hines Nurseries.

18. One of the members of the Board of Managers of Hines Nurseries is Mr. William Allen. It is my understanding that Mr. Allen is (i) the chief executive officer of an entity in which an affiliate of Black Diamond Commercial Finance, L.L.C., holds a minority ownership interest, and (ii) a member of an operating committee for another affiliate of Black Diamond Commercial Finance, L.L.C.

19.     The sole member of Hines Parent is Consolidated Horticulture, and the sole member of Hines Nurseries is Hines Parent. A chart depicting the ownership structure of the Debtors is attached as <u>Exhibit A</u>. I am the President and Chief Executive Officer of Consolidated Horticulture, Hines Nurseries and Hines Parent.

## MSA With Bordiers Holdco

20.     Hines Nurseries and BD Bordiers Holdco LLC ("Bordiers Holdco") are parties to that certain Management Services Agreement, dated as of February 1, 2010 (the "MSA"). Bordiers Holdco is an affiliate of Black Diamond Commercial Finance, L.L.C.

21.     As described in the MSA, Hines Nurseries and Bordiers Holdco entered into the MSA in order to allow Bordiers Holdco to operate its Business (as defined in the MSA) during an interim period between its acquisition of the Assets (as defined in the MSA), to complete the sale of Inventory (as defined in the MSA), and to collect all Receivables (as defined in the MSA). Under the MSA, Hines Nurseries provides certain services to Bordiers Holdco in connection with the operation of the Business, which include, among other things, the maintenance, sales, distribution and administration of the Inventory, and the collection of the Receivables.

22.     Pursuant to the MSA, Hines Nurseries is required to pay Bordiers Holdco the net proceeds ("Net Proceeds") of sale received by Hines Nurseries in connection with the sale of the Inventory and collection of the Receivables within five (5) days of the collection of each respective Receivable. The Net Proceeds under the MSA equal the gross proceeds received though the sale of the Inventory minus $1.12 per equivalent unit sold, which amount is retained by Hines Nurseries for services provided under the MSA. In addition, pursuant to the MSA, the Net Proceeds received by Hines Nurseries with respect to the Receivables constitute property of Bordiers Holdco and are held "in trust" by Hines Nurseries for Bordiers Holdco, notwithstanding

any commingling of such Net Proceeds with the cash of Hines Nurseries, until such time as the Net Proceeds are remitted to Bordiers Holdco.

23.     As of the Petition Date, Hines Nurseries had collected (but not yet remitted) approximately $177,600 of Net Proceeds. Postpetition, Hines Nurseries expects to remit that amount to Bordiers Holdco pursuant to the terms of the MSA and intends to continue to perform its obligations under the MSA postpetition in the ordinary course of business.

**D.     The 2008 Hines Horticulture Bankruptcy**

24.     On August 20, 2008 (the "2008 Petition Date"), Hines Horticulture, Inc. and Hines Nurseries, Inc., a direct wholly owned subsidiary of Hines Horticulture, Inc., each filed petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "2008 Chapter 11 Cases").[4] As of March 31, 2008, Hines Horticulture, Inc. and Hines Nurseries, Inc. (collectively, the "2008 Debtors") reported approximately $317.3 million in total liabilities, including secured obligations under the 2008 Debtors' prepetition secured credit facility in the approximate amount of $38.0 million (the "Credit Facility") and approximately $175.0 million on their 10.25% senior subordinated unsecured notes due 2011 (the 10.25% Senior Notes"). A majority of the 10.25% Notes were held by funds affiliated with Black Diamond Capital Management, LLC. ("Black Diamond"). Before filing the 2008 Chapter 11 Cases, with the assistance of its financial advisors, the 2008 Debtors attempted to restructure through a debt-for-equity exchange of the 10.25% Senior Notes. The debt-for-equity exchange was unsuccessful, because the 2008 Debtors were unsuccessful in finding a party willing to provide them with the commitment required to refinance their obligations under their existing Credit Facility and to provide the requisite liquidity to fund ongoing operations. Thereafter, with the assistance of their advisors, the 2008

---

[4]     The 2008 Chapter 11 Cases were jointly administered by this Court under Case No. 08-11922 (KJC), *In re Hines Horticulture, Inc. et.al.*

Debtors engaged in extensive negotiations with an affiliate of Black Diamond for the sale of all or substantially all of their assets. Those negotiations culminated in the execution of a stalking-horse purchase agreement (the "Black Diamond Purchase Agreement") shortly before the filing of the 2008 Chapter 11 Cases.

25.     On the 2008 Petition Date, the 2008 Debtors filed a *Motion for Entry of (A) an Order Approving Bid and Notice Procedures and Bid Protections, and (B) an Order (I) Approving an Asset Purchase Agreement Between the Debtors and the Buyer, or Such Other Purchase Agreement(s) Between the Debtors and the Successful Bidder, (II) Authorizing the Sale of All or Substantially All of the Assets of the Debtors Free And Clear of All Liens, Claims, Encumbrances and Other Interests, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (IV) Granting Related Relief* (the "Sale Motion") [Docket No. 18 in the 2008 Chapter 11 Cases]. Pursuant to the Sale Motion, the 2008 Debtors sought authority, among other things, to sell all or substantially all of their assets (the "Sale") to an affiliate of Black Diamond pursuant to the Black Diamond Purchase Agreement.

26.     On December 16, 2008, this Court approved the Sale and the Black Diamond Purchase Agreement by Order entered in the 2008 Chapter 11 Cases (the "Sale Order") [Docket No. 410 in the 2008 Chapter 11 Cases]. Pursuant to the Sale Order, the Debtors in these Chapter 11 Cases are not successors to or consolidated with the 2008 Chapter 11 Debtors. Sale Order, at Paragraph T. The Sale was completed on January 9, 2009. Pursuant to the Sale, the assets covered by the Black Diamond Purchase Agreement were transferred to Hines Nurseries, as purchaser. Sale Order, at Exhibit A.

27.     Shortly thereafter, on January 28, 2009, this Court confirmed the *First Amended Joint Chapter 11 Plan of Reorganization For Hines Horticulture, Inc. and Hines Nurseries, Inc.* [Docket No. 522 in the 2008 Chapter 11 Cases].

**E.     Customers**

28.     The Debtors' retail customers include home centers, mass merchandisers, independent garden centers and garden center chains. The Debtors enjoy competitive advantages in selling to these customers due to their ability to provide a broad assortment of consistently high quality products in large volumes, their nationwide distribution network and their value-added services such as custom labeling, bar-coding, full electronic data interchange and technical support.

**F.     Distribution**

29.     The Debtors distribute their products directly from their nursery sites to their retail customers primarily using third-party common carriers and the Debtors' fleet of approximately 49 trucks, four of which are owned and the balance of which are leased. In addition, the Debtors use a variety of product shipping techniques, such as specialized shelving, protective racks and special loading techniques. Nursery products are distributed nationwide, except color plants, which are typically distributed only within a 300-mile radius of each nursery.

**G.     Properties**

30.     The Debtors operate eight commercial nursery facilities located in Arizona, California, Oregon and Texas as set forth below.  As of July, 2010, the Debtors owned approximately 2,686 acres related to their nursery facilities. In addition, the Debtors leased approximately 854 acres related to their nursery facilities (including leases from Blooming Farm

Inc., an affiliated entity).[5] Approximately 2,600 acres were usable for production, with approximately 2,000 of those acres currently in production. In addition, the Debtors use greenhouse space located on the following facilities:

| Acreage | | | | |
|---|---|---|---|---|
| **Location** | **Own** | **Lease** | **Total** | **Primary Product(s)** |
| Chino Valley, AZ | 67 | 0 | 67 | Color plants |
| Fallbrook, CA | 248 | 13 | 261 | Color plants/Shrubs |
| Fresno, CA | 48 | 9 | 57 | Color plants |
| Forest Grove, OR | 670 | 343[6] | 1,013 | Shrubs |
| Houston, TX | 432 | 0 | 432 | Color plants/Shrubs |
| Irvine, CA | 0 | 223 | 223 | Color plants /Shrubs |
| Winters, CA | 1,221 | 0 | 1,221 | Shrubs |
| Somis, CA | 0 | 201 | 201 | Color plants/Shrubs |
| **Total** | **2,686** | **789** | **3,475** | |

## H.    Competition

31.    Competition in the nursery products segment of the lawn and garden industry is based principally on the breadth of product offering, consistent product quality and availability, customer service and price.  The nursery products segment is highly fragmented.  According to

---

[5] More than 20% of Blooming Farm Inc. is owned by New Blooming Land LLC. and by Ms. Pieropan, the Debtors' Senior Vice President and Chief Financial Officer, and Mr. Stephen Thigpen, the Debtors' Chief Executive Officer, and other members of the Debtors' current and former management.

[6] The Debtors lease all such 343 acres from Blooming Farm Inc. Under the current lease, which expires on February 28, 2018, the Debtors are obligated to make annual lease payments of approximately $67,476. Pursuant to such lease, the Debtors have an option to purchase the land and certain rights of first refusal.

the 2002 Census of Agriculture released in June 2004 by the U.S. Department of Agriculture's National Agricultural Statistics Service, the nursery business is comprised of approximately 60,000 primarily small and regionally based growers. The Debtors believe that they are one of two nursery product companies that are able to serve every major regional market in North America, the Debtors' only national competitor being Monrovia Nursery Company. In each of their markets, the Debtors compete with large regional growers and many other smaller regional and local growers. The Debtors believe that their key competitive advantages are their ability to provide consistent, high quality products in large volumes, their nationwide distribution network and their value-added services.

## I.      Seasonality and Liquidity

32.      The Debtors' business is highly seasonal in nature, with the majority of sales typically occurring in the first half of the year. In particular, the Debtors' sales are strongest in the second quarter, which corresponds to the Spring gardening season. In 2009, approximately 64% of net sales occurred in the first half of the year. Approximately 55% of net sales occurred in the second quarter of 2009. Moreover, the seasonal nature of the Debtors' operations causes significant fluctuations in certain components of working capital (primarily accounts receivable and inventory) during the growing and selling cycles as the Debtors experience substantial net cash outflows during inventory buildups versus substantial net cash inflows during sales and collection periods. As a result, operating activities during the first and fourth quarters use significant amounts of cash, and in contrast, operating activities for the second and third quarters historically have generated cash as the Debtors ship inventory and collect receivables.

## J.    Summary of Prepetition Credit Facilities

### (a)    The Prepetition Revolving Loan

33.    Before the commencement of the Debtors' Chapter 11 Cases, pursuant to that certain Loan and Security Agreement, dated as of January 9, 2009 (as amended, restated, supplemented or otherwise modified from time to time, the "ABL Credit Facility"), by and among Hines, as borrower, the financial institutions, as lenders (collectively, the "ABL Lenders"), and Bank of America, N.A., individually as a lender and as agent for the ABL Lenders (as the agent, the "ABL Agent"), the ABL Lenders[7] agreed to make certain loans and other financial accommodations to Hines, including a revolving credit facility in an aggregate amount of up to $78 million, with a $15 million letter of credit sub-limit. Under the loan documents executed as of January 9, 2009 (as they have been amended, restated, supplemented or otherwise modified from time to time, together with the ABL Credit Facility, the "ABL Credit Facility Documents"), Hines granted to the ABL Agent, for the benefit of itself and the ABL Lenders under the ABL Credit Facility Documents, security interests in and liens upon substantially all of the property of Hines, including (but not limited to) all accounts, chattel paper (including electronic chattel paper), all commercial tort claims, all deposit accounts, all documents, all general intangibles (including intellectual property), all goods including inventory, equipment and fixtures, all instruments, all investment property, all letter-of-credit rights, and all supporting obligations, all monies, all accessions to, substitutions for, and all replacements, products and cash and non-cash proceeds of the foregoing, including proceeds of and unearned premiums with

---

[7]    The ABL Lenders include BDCM Opportunity Fund II, L.P. and BDC Finance, L.L.C., affiliates of the DIP Agent and the DIP Lenders, who hold (in the aggregate) approximately 53% of the Revolver Commitments.

respect to insurance policies, and claims against any person for loss, damage or destruction of any collateral; and all books and records (including customer lists, files, correspondence, tapes, customer programs, print-outs and computer records) pertaining to the foregoing (collectively, the "Hines Prepetition Collateral").

34.     Pursuant to that certain Guaranty Agreement, also dated as of January 9, 2009 (as amended, modified, restated, reaffirmed or supplemented prior to the date hereof, the "Guaranty Agreement"), Hines Parent unconditionally guaranteed the obligations of Hines under the ABL Credit Facility Documents. To secure all obligations under the Guaranty Agreement and ABL Credit Facility Documents, Hines Parent executed that certain Security Agreement, also dated January 9, 2009 (as amended, modified, restated, reaffirmed or supplemented prior to the date hereof, the "Parent's Security Agreement"). In the Parent's Security Agreement, Hines Parent granted to the ABL Agent, for the benefit of the ABL Lenders, a security interest in and lien upon substantially all the property of Hines Parent (collectively, with the Hines Prepetition Collateral, the "Prepetition Collateral").

**(b)     The Prepetition Term Loan**

35.     Pursuant to that certain Term Loan and Security Agreement, dated January 9, 2009 (as amended, restated, supplemented or otherwise modified from time to time, the "Term Loan Credit Facility"), by and among Hines, as borrower, the financial institutions, as lenders (collectively, the "Term Loan Lenders"), and Black Diamond Commercial Finance, L.L.C., as agent for the Term Loan Lenders[8] (the "Term Loan Agent"), the Term Loan Lenders agreed, subject to the terms and conditions set forth in the Term Loan Credit Facility, to loan Hines the principal amount of $8.0 million.

**(c)     The Prepetition Subordinated Loan**

36.     Pursuant to that certain Subordinated Loan and Security Agreement, also dated January 9, 2009 (as amended, restated, supplemented or otherwise modified from time to time, the "Sub Loan Credit Facility"), by and among Hines, as borrower, the financial institutions, as lenders (collectively, the "Sub Loan Lenders"),[9] and Black Diamond Commercial Finance L.L.C., as agent for the Sub Loan Lenders (the "Sub Loan Agent"), the Sub Loan Lenders agreed, subject to the terms and conditions set forth in the Sub Loan Credit Facility, to loan Hines $10.0 million.

37.     To secure all obligations under the Term Loan Credit Facility and the Sub Loan Credit Facility (collectively, as amended, restated, supplemented or otherwise modified from time to time, the "Term Loan and Sub Loan Credit Facilities"), Hines granted to the Term Loan

---

[8]  The Term Loan Lenders are BDCM Opportunity Fund II, L.P. and BDC Finance, L.L.C., affiliates of the DIP Agent and the DIP Lenders.

[9]  The Sub Loan Lenders are BDCM Partners I, L.P., BDCM Opportunity Fund II, L.P. and BDC Finance Intermediate Corp. (CHG), affiliates of the DIP Agent and the DIP Lenders.

Agent, for the benefit of the Term Loan Lenders and the Sub Loan Agent, for the benefit of the Sub Loan Lenders (collectively, the "Term Loan and Sub Loan Lenders") a security interest in and lien upon substantially all of the Prepetition Collateral; provided, however, that (a) the liens and security interests of the ABL Lenders and the Term Loan Lenders are subject to that certain Intercreditor Agreement, dated January 9, 2009 (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), by and among, (i) Hines, as borrower, (ii) the ABL Agent, on behalf the ABL Lenders, and (iii) the Term Loan Agent, on behalf of the Term Loan Lenders, and (b) the liens and security interests of the Sub Loan Lenders are subject to that certain Subordination and Intercreditor Agreement, also dated January 9, 2009 (as amended, restated, supplemented or otherwise modified from time to time, the "Subordination Agreement"), by and among (i) Hines, as borrower, (ii) the ABL Agent, on behalf of the ABL Lenders, (iii) the Term Loan Agent, on behalf of both the Term Loan Lenders, and (iv) the Sub Loan Agent, for the benefit of the Sub Loan Lenders. Pursuant to the Intercreditor Agreement, (x) the Term Loan Agent, for the benefit of the Term Loan Lenders, has a senior lien on the Term Loan Primary Collateral[10] (primarily including real property and fixed assets) and a junior lien on the Revolving Credit Primary Collateral, and (y) the ABL Agent, for the benefit of the ABL Lenders, has a senior lien on the ABL Primary Collateral (primarily including inventory and accounts receivables) and a junior lien on the Term Loan Primary Collateral. Pursuant to the terms of the Subordination Agreement, the liens and security interests granted to the Sub Loan Agent for the benefit of the Sub Loan Lenders are subordinated to the liens and security interests

---

[10] Certain capitalized terms in this paragraph used but not otherwise defined by the DIP Demand Note or the Interim Order shall have the meanings set forth in the Intercreditor Agreement.

granted to the Term Loan Agent for the benefit of the Term Loan Lenders and the ABL Agent for the benefit of the ABL Lenders.

38.     As of the Petition Date, Hines and Hines Parent are indebted to (a) the ABL Lenders in the amount of not less than $48,565,895.30 (plus interest, fees and expenses to the extent provided in the facility), (b) the Term Loan Lenders in the amount of not less than $8,000,000.00 (plus interest, fees and expenses to the extent provided in the facility), and (c) the Sub Loan Lenders in the amount of not less than $16,781,451.42 (plus interest, fees and expenses to the extent provided in the facility). The aggregate due on the Prepetition Credit Agreements, as of the Petition Date, is approximately $71,367,346.72 (collectively, the "Prepetition Indebtedness").

39.     After filing their petitions, the debtors intend to operate their businesses in the ordinary course, while pursuing all options for maximizing value. In the various First Day Motions, the Debtors seek relief on an expedited basis that will help preserve the value of their assets and permit them to conduct these cases efficiently and economically. The basis for each of the First Day Motions is set forth below.

# PART III.

# FIRST DAY MOTIONS

40.     In order to enable the Debtors to minimize the adverse effects of the commencement of these chapter 11 cases, the Debtors have requested various types of relief in the First Day Motions filed concurrently with this Declaration.  A summary of the relief sought in each First Day Motion is set forth below.

41.     I have reviewed each of these First Day Motions (including the exhibits and schedules thereto).  The facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the type of relief sought in each of the First Day Motions:  (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their current business operations; and (b) is essential to maximizing the value of the Debtors' assets for the benefit of their estates and creditors.

**A.     Motion of the Debtors for an Order Directing Joint Administration of Their Related Chapter 11 Cases (the "Joint Administration Motion")**

42.     Many of the motions, hearings and orders in these Chapter 11 Cases will jointly affect each and every Debtor. By jointly administering these Chapter 11 Cases, I believe that the Debtors will be able to reduce fees and costs in connection with the administration of these cases by avoiding the duplication of effort associated with, for example, filing multiple duplicative documents in the Debtors' various individual cases, monitoring each of the Debtors' individual dockets and maintaining individual case files for each of the Debtors that will largely duplicate one another.

43.     In addition, I believe that the ability of parties in interest to monitor these cases will be facilitated by having all pleadings grouped together on one docket. Joint administration also will relieve the Court of the burden of entering duplicative orders and maintaining

duplicative files. Finally, supervision of the administrative aspects of these Chapter 11 Cases by the U.S. Trustee will be simplified.

**B.    Application for Order Approving Debtors' Retention of Epiq Bankruptcy Solutions, LLC as Claims, Notice and Balloting Agent Pursuant to § 28 U.S.C. § 156(c), Bankruptcy Rule 2002(f) and Local Rule 2002-1(f) (the "Claims Agent Motion")**

44.    The Debtors seek entry of an order authorizing and approving the retention of and appointing Epiq Bankruptcy Solutions, LLC ("Epiq"), nunc pro tunc to the Petition Date, as claims, noticing and balloting agent (the "Claims and Noticing Agent") for the Debtors and, as applicable, the Clerk to, among other things: (i) serve as the Court's notice agent to mail certain notices to the estates' creditors and parties-in-interest, (ii) provide computerized claims, claims objections and balloting database services, and (iii) provide expertise, consultation and assistance with claim and ballot processing and with other administrative information related to the Debtors' bankruptcy cases.    With the large number of creditors that the Debtors have identified, the Debtors believe it is in the best interests of their estates and their creditors to appoint Epiq as agent for the Clerk.

45.    I understand that Epiq is one of the country's leading chapter 11 administrators with experience in noticing, claims processing, assisting with claims reconciliation and distribution.  I believe Epiq is well qualified to provide the Debtors with experienced noticing, claims and balloting services in connection with theses cases, and has substantial experience in the matters upon which it is to be engaged.

46.    Accordingly, I believe it is in the best interest of the Debtors' estates to seek the entry of an order retaining and appointing Epiq as the agent for the Clerk and as custodian of official court records and to perform such other services as may be required by the Debtors. Additionally, the Debtors seek authorization to compensate Epiq for services rendered and to

reimburse Epiq for expenses incurred without further order of this Court upon the Debtors' receipt of reasonably detailed statements of fees and expenses.

**C.    Motion of the Debtors for an Order Authorizing, But Not Directing, the Debtors to Pay Certain Prepetition (A) Wages, Salaries, Bonuses and Other Compensation, (B) Reimbursable Employee Expenses. and (C) Employee Medical and Similar Benefits (the "Wages Motion")**

47.    As of the Petition Date, the Debtors directly employ approximately 825 full-time employees and 75 part-time employees (collectively, the "Employees"), of whom approximately 750 are full-year employees (the "Core Employees")  and approximately 150 are seasonal employees (the "Seasonal Employees").  The Debtors' use of Seasonal Employees fluctuates significantly during the year.  In addition to these Employees, from time to time, the Debtors also use the services of certain third party temporary workers (the "Temporary Workers") who are not Employees of the Debtors.  Currently, the Debtors use the services of approximately 250 Temporary Workers.

48.    The Employees and Temporary Workers perform a variety of critical functions, including purchasing, sales, customer service, inventory control, research and development, transportation, and a variety of administrative, accounting, finance, supervisory, management and other tasks.  The Employees' and Temporary Workers' skills and their knowledge and understanding of the Debtors' operations, customer relations and infrastructure are essential to the Debtors' ability to preserve the value of their businesses.

49.    In order to minimize the personal hardship that the Employees (and, in turn, the Debtors) would suffer if prepetition Employee-related obligations are not paid when due or as expected and to maintain morale and stability in the Debtors' workforce, the Debtors seek authority, to be exercised in their sole discretion, to pay and honor certain prepetition claims related to, among other things, wages, salaries, commissions and other compensation, federal and

state withholding taxes and other amounts withheld (including withholdings for garnishments, Employees' share of insurance premiums and taxes), health benefits, insurance benefits, workers' compensation benefits, vacation time, sick leave, life and accidental death and dismemberment insurance, short-term and long-term disability coverage, and travel accident insurance and all other benefits that the Debtors have historically provided in the ordinary course of business (collectively, the "Employee Wages and Benefits"), and to pay all costs incident to the foregoing. The Debtors also seek authority, to be exercised in their sole discretion, to continue to reimburse Employees for various reimbursable expenses. In addition, the Debtors request the right to modify, change and discontinue any of the Employee Wages and Benefits, and the policy related to reimbursable expenses, and to implement new Employee Wages and Benefits in the ordinary course of business during these Chapter 11 Cases in their sole discretion without the need for further Court approval. Further, the Debtors seek authority to pay the outstanding prepetition wage-related claims of the Temporary Workers.

**Unpaid Salary and Wage Compensation**

50.     In the ordinary course of business, the Debtors incur payroll obligations to the Employees. Such obligations generally comprise wages and salaries, but also include commission payments for sales productivity. The Debtors' payroll is made by direct deposit through electronic transfer of funds directly to Employees, with the balance of Employees receiving checks. These payroll payments are primarily made through the Debtors' payroll processor, Ceridian Corporation ("Ceridian"). Certain Employees are paid by live check in lieu of direct deposit. In such cases, the Debtors fund the Payroll Account with amounts necessary to fund payroll to Employees paid by live check on the Thursday immediately before the Pay Date. On the Pay Date, The Debtors issue checks to employees paid by live check. Additionally, the Debtors use a third party service, Automatic Data Processing, Inc. ("ADP"), to maintain time

clocks at each of the Debtors' nurseries to record and maintain Employee hours. The services of both Ceridian and ADP are crucial to the smooth functioning of the Debtors' payroll system and to the Debtors' operations generally. The Debtors request authority to pay up to $50,000 in prepetition amounts due to ADP and Ceridian, and to continue to pay ADP and Ceridian in the ordinary course of business as routinely done prior to the Petition Date.

51.     Because all of the Employees are paid in arrears, as of the Petition Date, some of the Employees have not been paid all of their prepetition wages. Additionally, some Employees may be entitled to compensation because (a) discrepancies may exist between the amounts paid and the amounts that should have been paid, and (b) some payroll checks issued to Employees prior to the Petition Date may not have been presented for payment or may not have cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date.

52.     The Debtors believe that, as of the Petition Date, approximately $1.3 million in total accrued Employee Wages, salaries and amounts withheld from Employees' payroll checks (but excluding commissions, reimbursable expenses, medical benefits and accrued vacation benefits) was earned prior to the Petition Date and remains unpaid to Employees (collectively, the "Unpaid Compensation"). The Debtors seek authority, but not direction, to pay the Unpaid Compensation in the ordinary course of business, as routinely done prior to the Petition Date.

53.     In addition, the Debtors procure the services of Temporary Workers who work on an hourly basis. For the most part, these Temporary Workers are employed through employment agencies. The Debtors remit compensation for the Temporary Workers' services directly to the applicable employment agencies, which in turn pay the Temporary Workers (collectively, the "Temporary Workers Compensation"). These Temporary Workers, among other things: (a) help to tend and maintain the plants located in the Debtors' greenhouses, (b) sell and merchandise the

Debtors' products throughout the country and/or (c) provide technology services for the Debtors. As of the Petition Date, the Debtors estimate that they owe approximately $800,000 on account of Temporary Workers Compensation. The Debtors seek authority, but not direction, to pay in the ordinary course of business the employment agencies for the benefit of the Temporary Workers Compensation, as routinely done prior to the Petition Date.

**Deductions and Withholdings**

54. During each applicable pay period, the Debtors routinely deduct certain amounts from paychecks, including, without limitation, (a) garnishments, child support and similar deductions and (b) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein (such as an Employee contributions to vision care benefits, Employee-paid insurance premiums for certain benefits, contributions under flexible spending plans, legally ordered deductions and miscellaneous deductions) (collectively, the "Deductions"). The Debtors forward the amount of the Deductions to the appropriate third-party recipients. On average, the Debtors have deducted approximately $152,000 from the Employees' paychecks per month. Due to the commencement of the Chapter 11 Cases, however, certain Deductions that were deducted from Employees' earnings may not have been forwarded to the appropriate third-party recipients prior to the Petition Date. Accordingly, the Debtors seek authority to continue to forward these prepetition Deductions to the applicable third-party recipients on a postpetition basis, in the ordinary course of business, as routinely done prior to the petition Date.

55. Further, the Debtors are required by law to withhold from an Employee's wages amounts related to federal, state and local income taxes, social security and Medicare taxes for remittance to the appropriate federal, state or local taxing authority (collectively, the "Withheld Amounts"). The Withheld Amounts are approximately $510,000 per month. The

Debtors must then match from their own funds for social security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (the "Employer Payroll Taxes," and together with the Withheld Amounts, the "Payroll Taxes"). The Debtors ask that they be authorized, but not directed, to continue to honor, process and remit the prepetition payments for the Payroll Taxes on a postpetition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

**Honoring Checks for, and Payment of, Reimbursable Expenses**

56. Prior to the Petition Date and in the ordinary course of their business, the Debtors reimbursed Employees for certain expenses incurred by the Employees in the scope of their employment (the "Reimbursable Expenses"). The Reimbursable Expenses include certain expenses for (a) relocation costs, (b) entertainment expenses incurred in developing business opportunities, (c) travel expenses for meals, hotels and rental cars, and (d) automobile allowances or use of a company car. For example, from time to time, the Debtors offer certain Employees reimbursement for relocation expenses to incentivize desirable candidates to accept positions with the Debtors (the "Relocation Expenses"). The Debtors believe that as of the Petition Date there are no amounts outstanding on account of Relocation Expenses. Moreover, the Debtors reimburse certain Employees for certain approved entertainment expenses incurred in maintaining business relationships or pursuing new business. The Debtors also reimburse certain Employees for reasonable meal, hotel and rental car expenses incurred when traveling in the course of their employment. In addition, the Debtors provide automobile allowances to certain key executives and key sales employees whose responsibilities require them to travel extensively (each, an "Automobile Allowance"). Accordingly, to avoid harming Employees who incurred the Reimbursable Expenses, the Debtors request authority, to be exercised in their sole discretion, to (a) continue reimbursing the Reimbursable Expenses in accordance with prepetition practices,

(b) modify their prepetition policies relating thereto as they deem appropriate, and (c) pay all Reimbursable Expenses that accrued prepetition.

**Commission Programs**

57.     In order to incentivize certain Core full-time Employees to maximize sales, the Debtors offer a commissions program (the "Commissions Program"). Employees who participate in the Commissions Program receive a base salary and a commission of up to 10% on their sales. Participants' awards are calculated and paid on a monthly basis. The Debtors request the authority, to be exercised in their sole discretion, to continue the Commissions Program in the ordinary course of business and continue the Commission program postpetition, to revise the Commissions Program consistent with past practice and to pay any prepetition amounts related to the Commissions Program.

### Employee Benefits

58.     The Debtors offer certain of their Employees the ability to participate in a number of insurance and benefits programs, including health care, dental and vision plans, workers' compensation, vacation time and other paid leaves of absence, flexible benefit plans, life insurance, accidental death and dismemberment insurance, short-term and long-term disability insurance, and travel accident insurance (collectively, the "Employee Benefit Programs").

**Health Plans**

59.     The Debtors offer their Core Employees who work a minimum of 25 hours per week certain medical dental and vision plans (collectively, the "Health Plans"). The Debtors seek authority, to be exercised in their sole discretion, to (a) continue the Anthem Medical Plan, the Anthem HMO, the Kaiser Medical Plan, the SIMNSA Medical and Dental Plan, the Delta Dental Plans and the Vision Service Plan for their Employees in the ordinary course of business,

(b) continue making the above-described contributions (and forwarding employee contributions in the case of the Vision Service Plan) to such benefit programs, and (c) pay any amounts related thereto, including on account of any premiums and claim amounts, to the extent that they remain unpaid as of the Petition Date.

**Workers' Compensation**

60.     The Debtors provide workers' compensation insurance for their Employees, including Seasonal Employees, at the statutorily-required level for each state in which it has employees (the "Workers' Compensation Program"). Except for Employees in Arizona and Oregon (which are state-administered programs), workers' compensation benefits are provided through a policy ("The Hartford Policy") provided by the Debtors' current insurance carrier. Arizona and Oregon each administer their own state-run workers' compensation programs. On a monthly basis, the Debtors pay a percentage of the payroll amounts for each employee employed in Arizona and Oregon, respectively, in premium amounts (the "State Insurance Monthly Premiums"). The State Insurance Monthly Premiums vary depending on the amount of employees currently employed in those states.

61.     Prior to the commencement of the premium-based Hartford Policy, the Debtors obtained workers' claims-made compensation coverage from CNA and Zurich. Under these programs, CNA and Zurich administered and paid allowed workers' compensation claims and would recover these advanced costs (plus premium costs) from the Debtors. In order to guaranty the Debtors' payment obligations under these claims-made policies, CNA and Zurich each obtained letters of credit collateralized in the amount of $2,366,500 and $100,000 respectively (together, the "Letters of Credit"). The Debtors currently pay CNA and Zurich the allowed amounts of the prior workers' compensation claims under those policies and request authority to continue to so postpetition in order to prevent both CNA and Zurich from drawing

down on their respective letters of credit. The total estimated amount of potentially allowed workers' compensation claims that arose within the policy periods when CNA and Zurich provided workers' compensation coverage will likely not exceed $900,000 (the "Old Workers Compensation Claims"). The Debtors seek authority, in their discretion, to pay the Old Workers Compensation Claims, in the ordinary course of business.

**Vacation, Sick Leave and Other Leaves of Absence**

62.     The Debtors provide vacation time to their Core Employees who work a minimum of 25 hours per week as a paid time-off benefit (the "Vacation Time"). The amount of Vacation Time available to a particular Core Employee and the rate at which such Vacation Time accrues is generally determined by the Core Employee's position and the length of full- time employment. In addition, in the ordinary course of business, Core Full-Time Employees who work a minimum of 25 hours per week are eligible for sick leave due to illness or injury up to five days per year ("Sick Leave"). Core Employees may not cash out their unused Sick Leave upon termination. The Debtors also allow their Core Employees to take certain other leaves of absence for personal reasons, many of which are required by law ("Leaves of Absence"). Leaves of Absence include family medical leaves, pregnancy, adoption and foster care leaves, military leaves, jury duty, voting leaves, personal leaves and bereavement leaves.

63.     The Debtors request that they be authorized, but not directed, to continue to their Vacation Time, Sick Leave and Leaves of Absence policies in the ordinary course of business postpetition, and to honor (but not pay) any prepetition amounts related thereto in accordance with their policies.

**Additional Employee Benefits**

64.     The Debtors provide all Core Employees who work a minimum of 25 hours per week with primary life insurance coverage and primary accidental death and

dismemberment insurance through MetLife, a third-party insurer (the "Life and AD&D Insurance").

65.     Core Employees who work a minimum of 25 hours per week are also offered the opportunity to purchase supplemental life insurance through MetLife Supplemental Life and Accidental Death and Dismemberment Insurance Programs (the "Supplemental Life and AD&D Insurance"), the premiums for which are paid entirely by the electing Employee.

66.     In addition, the Debtors provide Core Full-Time Employees who work a minimum of 25 hours per week with short- and long-term disability benefits through MetLife (the "Short-Term Disability Benefits" and the "Long-Term Disability Benefits," respectively). The Debtors pay for basic Short-Term Disability Benefits for all Core Full-Time Employees.

67.     The Debtors provide their Core Employees discount travel accident benefits for business travel ("Travel Accident Insurance").

68.     The Debtors offer their Core Employees who work a minimum of 25 hours per week the ability to contribute a portion of their pre-tax compensation to flexible spending accounts to pay for eligible out-of-pocket health care and dependent care premiums and expenses (the "Flexible Benefit Plan").

69.     Through the Wage Motion, the Debtors ask that they be authorized, but not directed, to (a) continue (i) the Life and AD&D Insurance and the Supplemental Life and AD&D Insurance (as referenced above), (ii) the Short-Term Disability Benefits and the Long-Term Disability Benefits (each as referenced above), (iii) the Travel Accident Insurance (as referenced above), and (iv) the Flexible Benefit Plan (as referenced above), (b) continue making the above-described contributions to such benefit programs, (c) pay any amounts related thereto, including on account of any premiums and claim amounts, to the extent that they remain unpaid on the

Petition Date, (d) continue to honor and process the Employees' prepetition contribution payments related to the benefit programs, and (e) revise any of the above-described benefit programs in the ordinary course of business.

70. Through the Wage Motion, the Debtors seek authority to pay and honor, in the ordinary course of business and in their sole discretion, prepetition claims and obligations related to (a) Unpaid Compensation, including related Payroll Services (b)Workers Compensation Program, (c) Deductions, Withheld Amounts, and Payroll Taxes, (d) Reimbursable Expenses, (e) the Commissions Program, and (f) the Employee Benefit Programs, and any other benefit program set forth in the Wage Motion.

71. I believe that paying prepetition wages and employee benefits will benefit the estates and their creditors by allowing the Debtors' business operations to continue without interruption. Indeed, I believe that without the requested relief, their Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors. Such a development would deplete the Debtors' workforce, hindering the Debtors' ability to meet their customer obligations and, likely, diminishing stakeholder confidence in the Debtors' ability to successfully preserve and enhance the value of their estates. I believe that there can be no doubt that the Debtors must do their utmost to retain their workforce by, among other things, continuing to honor all wage, benefit and related obligations, including the Employee Wages and Benefits that accrued prepetition. The loss of valuable Employees and Temporary Employees and the resulting search for replacement employees would create an unnecessary distraction when the Debtors are stabilizing operations at the outset of these chapter 11 cases. The Debtors would also incur otherwise needless recruiting expenses in identifying and attracting replacement employees.

**D.** **Motion of the Debtors for an Order Under 11 U.S.C. §§ 105, 363, 1107 and 1108 Authorizing (I) Maintenance of Certain Existing Bank Accounts, (II) Continued Use of Existing Business Forms, (III) Continued Use of Cash Management System, and (IV) Waiver of Section 345(b) Deposit and Investment Requirements (the "Cash Management Motion")**

72.     In the ordinary course of business, the Debtors utilize an integrated, centralized cash management system under which funds are collected in a centralized funding account by the Debtors, transferred to various concentration accounts and disbursed, through other accounts, to pay operating expenses (collectively, the "Cash Management System"). The Cash Management System is the pivotal means by which the Debtors centrally monitor corporate funds, ensure liquidity, comply with the requirements of their financing agreements, minimize administrative expenses by facilitating the transfer of funds and maintain accurate control over their liquidity position at any given time.

73.     The Debtors' Cash Management System is managed primarily by the Debtors' financial personnel at their corporate headquarters in Irvine, California, where the Debtors' books and records related to the Cash Management System are located. The Cash Management System enables the Debtors to (a) forecast and report the Debtors' cash position, (b) monitor the collection and disbursement of funds, and (c) maintain control over the administration of their various bank accounts, which is required to effect collection, disbursement and movement of cash throughout the Debtors' operations.

74.     The Cash Management System consists of five separate Bank Accounts, each of which is described more fully in the Cash Management Motion. All of the Bank Accounts are maintained at Bank of America ("BofA"). The Bank Accounts include one funding account, one lockbox account (the "Lockbox Account"), one payroll disbursement account (the "Payroll Account"), one accounts payable disbursement account (the "Accounts Payable Account") and one merchant collection account (the "Merchant Account").

75.     Through the Cash Management Motion, the Debtors seek authority to continue to use the Cash Management System, as such system may be modified pursuant to the requirements of any Court-approved cash collateral usage, and related order of this Court. I believe the Cash Management System constitutes an essential business practice and was created and implemented by the management of the Debtors in the exercise of their business judgment. The use of the Cash Management System, moreover, is attributable to the numerous benefits it provides, including the ability to (a) process and timely pay expenses; (b) allow a mechanism for deposits from sales revenues; (c) ensure cash availability; (d) control and monitor corporate funds; and (e) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information. In addition, I believe preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with a substantial disruption of the Cash Management System will facilitate and enhance the Debtors' efforts to continue to operate postpetition.

76.     Furthermore, I do not believe that parties in interest will be harmed by the Debtors' continued use of their Cash Management System, including their Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that payments will not be made on any debts incurred before the Petition Date, other than those authorized by the Court, and to minimize the risk of other errors or misunderstandings. Under these circumstances, I believe that maintaining their Cash Management System is in the best interest of their respective estates and creditors. Indeed, I believe preserving the "business as usual" atmosphere of the chapter 11 cases and avoiding the unnecessary distractions that would inevitably be associated with any substantial disruption in the Cash Management System will facilitate the Debtors' overall efforts to preserve and enhance the value of their estates.

77.    To minimize expenses to their estates, I believe it is appropriate for the estate to continue using all checks, correspondence and business forms, including, but not limited to, letterhead, purchase orders and invoices, (collectively, and without limitation, the "Business Forms") as such checks and Business Forms were in existence immediately before the Petition Date – without reference to the Debtors' status as debtors in possession – rather than requiring the Debtors to incur the expense and delay of ordering entirely new checks and Business Forms. After the Debtors' existing check stock and Business Forms are depleted, the Debtors will make appropriate revisions to newly-ordered Business Forms and checks and affix the "Debtor in Possession" label thereon.  By virtue of the nature and scope of the Debtors' business operations and the customers and vendors with whom the Debtors deal on a regular basis, I believe it is important that the Debtors be permitted to continue to use their existing check stock and existing Business Forms without alteration or change, except as provided herein.

78.    The Debtors seek an interim waiver of the requirements to maintain the Bank Accounts without posting a bond or other security, as would otherwise be required whenever the funds on deposit exceed the amount permitted under the Bankruptcy Code.  Funds deposited into the Lockbox Account are swept daily and applied against the balance owed under the Prepetition Credit Facility.  Similarly, prior to the Petition Date, the Debtors' requests for financing to BofA were based on the goal of meeting daily disbursement requirements.  While daily deposits in certain Bank Accounts may temporarily exceed FDIC coverage, in order to pay payroll and other disbursements, the Bank Accounts do not generally maintain a balance in excess of $250,000 at any given time.  In this case, therefore, because most of the Bank Accounts do not hold a substantial amount for an extended period, I believe the risk of loss is minimal.  Finally, all of the

Bank Accounts are maintained at BofA, which, I am informed by my counsel, is a federally insured institution.

79.     I believe that it is critical that the Debtors utilize the Cash Management System and continue to use their existing business forms as set forth herein, without disruption. Accordingly, I believe it is appropriate to approve the Debtors' centralized Cash Management System and grant a waiver of the deposit amount requirements of the Bankruptcy Code on an interim basis pending a final hearing.

**E.      Motion of the Debtors for the Debtors for an Order Authorizing, But Not Directing, the Debtors to Pay in the Ordinary Course of Business Prepetition Claims of Shippers (the "Shippers Motion")**

80.     The Debtors operate eight nurseries in the United States (collectively, the "Nurseries") to grow the various shrubs, flowering plants, vines, trees and other horticultural goods that comprise the Debtors' product portfolio (collectively, the "Horticultural Goods"). The Debtors also use the Nurseries to process and ship deliveries of their Horticultural Goods to their customers. The Horticultural Goods are distributed nationwide, except for color plants, which are typically distributed only within a 300 mile-radius of the Nursery at which such color plants are grown.

81.     The Debtors maintain approximately 49 leased or owned trucks to help distribute the Horticultural Goods. In addition to the leased trucks, the Debtors use third-party freight services and common carriers (collectively, the "Shippers") to ensure prompt delivery of the Horticultural Goods and prevent spoilage given fluctuations in customer orders, seasonal demand spikes and the perishable nature of the Horticultural Goods. The Debtors generally contract with the Shippers to ship the Horticultural Goods from the Nurseries to the Debtors' customers located throughout the country.

82. The Debtors' use of Shippers will vary with seasonal demand (typically peaking between April and September). The market for available shipping capacity is competitive. The Debtors must contend with competitors and other consumers of shipping capacity to meet their own shipping, transportation and distribution needs.

83. I believe that the Debtors' ability to maintain an efficient distribution system is essential to their survival. Delays, interruptions in service or delivery stoppages could materially impair or destroy the value of the Horticultural Goods and the Debtors' businesses. I further believe that any disruption to the Debtors' ability to supply their customers in a timely fashion could threaten the Debtors' ability to stabilize and preserve such critical relationships at the outset of their chapter 11 cases.

84. The Debtors expect that, as of the Petition Date, the outstanding prepetition invoices of the Shippers for goods currently in transit are approximately $95,000 (the "Shipping Charges"). This balance can fluctuate on a daily basis depending on the timing of large deliveries and invoices. I have been informed that each Shipper that may receive payment as a result of the relief requested is currently in possession of Horticultural Goods that, in most cases, hold a sale value greater than the outstanding Shipping Charges due such Shipper. Thus, the Debtors request authority to pay prepetition Shipping Charges that the Debtors, in their business judgment, determine must or should be paid to obtain the release of products held by such Shippers; provided that the aggregate amount paid on account of Shipping Charges shall not exceed $95,000 without further order of the Court.

85. The Debtors' operations depend upon their ability to ensure delivery of the Horticultural Goods in a timely fashion. The Horticultural Goods are perishable by their very nature. I believe that any delay in their delivery could render the Horticultural Goods worthless;

a single truck pulled to the side of the road for even a brief time could result in the spoilage of an entire shipment. Moreover, the Debtors must compete to obtain the trucking capacity necessary to ship their Horticultural Goods. I believe that the Debtors' failure to satisfy the Shipping Charges could limit the Debtors' future access to necessary distribution channels even as they seek to revitalize their businesses. The Debtors' relationships with their customers are generally not governed by long term supply contracts. I further believe that the Debtors' failure to ensure the seamless delivery of the Horticultural Goods could destroy these pivotal relationships and the Debtors' ability to preserve and enhance value along with them. Thus, I believe that the relief requested in the Shippers Motion is an imperative for their ability to preserve and maximize the value of their estates.

**F.     Motion of the Debtors for an Order (A) Authorizing, but not Directing, the Debtors to Remit and Pay Certain Taxes and Fees, and (B) Authorizing and Directing Banks and Other Financial Institutions to Honor Related Checks and Electronic Payment Requests (the     "Taxes Motion")**

86.     In the ordinary course of business, the Debtors (i) pay sales and use taxes necessary to operate their businesses (collectively, the "Taxes"), and (ii) collect such Taxes from their customers for payment on behalf of the Debtors and, in some instances, the customers. In both cases, the proceeds collected by the Debtors are remitted to various governmental bodies (the "Taxing Authorities") in accordance with the requirements of such Authorities. On average, the Debtors generally collect between $1,000 and $2,000 per month in Taxes. Although the Debtors' records reflect that they are current on all of their Taxes that were due and payable as of the Petition Date, the Debtors will be liable for additional Taxes that relate to the prepetition period, but either have not yet been billed to the Debtors or are not yet due. The Debtors estimate that the amount of these Taxes will not exceed $10,000. This estimate does not include

additional prepetition tax liability that may later come due as a result of certain audits that are ongoing or may be commenced and remain unresolved as of the Petition Date.

87.     I am informed that any failure to make the requested payments could cause: (a) the Taxing Authorities to initiate audits of the Debtors that would unnecessarily divert their attention away from the administration of their chapter 11 cases; (b) the Taxing Authorities to file liens, seek to lift the automatic stay, and pursue other remedies that will harm the Debtors' estates; and (c) certain of the Debtors' directors and officers to face personal liability – even if failure to pay such Prepetition Taxes was not a result of malfeasance on their part – that would undoubtedly distract those key employees from their duties related to the Debtors' chapter 11 cases.

88.     I believe that the authority to pay Taxes as requested in the Taxes Motion is both appropriate and necessary and critical to the Debtors' continued, uninterrupted operations. I have been informed that non-payment may cause the Taxing Authorities to take precipitous actions, including but not limited to, conducting audits, filing liens, seeking to impose liability against the Debtors and their directors and officers, and, if applicable, seeking to lift the automatic stay, all of which would disrupt the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors' estates. I believe that payment of the Taxes will avoid these unnecessary and potentially costly governmental actions.

**G.     Motion of the Debtors for an Order Authorizing, but not Directing, the Debtors to Continue Their Customer Programs and Honor Prepetition Commitments Related Thereto (the "Customer Programs Motion")**

89.     The Debtors' have two primary customer programs under which they offer volume rebates and honor product returns and exchanges in the ordinary course of business, as described below.

90.     In the ordinary course of business, the Debtors offer certain volume rebates to some of their larger customers (the "Volume Rebates"). The amount of the Volume Rebates accrued at any given time will vary based on the volume of customer purchases, which in turn often vary from season to season. The Debtors negotiate the terms of the Volume Rebates on a customer by customer basis. The Volume Rebates represents a percentage of the aggregate amount of goods purchased by the customer. In most cases, the Volume Rebates are deducted by the customer when they make payments to the Debtors from subsequent purchases of the Debtors' products. The Debtors' obligations with respects to Volume Rebates vary from month to month and are calculated in arrears and the Debtors are unable to precisely estimate the amount of Volume Rebates incurred as of the Petition Date; however, they believe that their total outstanding obligations for Volume Rebates as of the Petition Date will not exceed $500,000.

91.     The Debtors' customers may also hold contingent claims against the Debtors for returns or exchanges relating to products sold prior to the Petition Date (collectively, the "Product Return Claims"). These limited Product Return Claims relate to products sold that became or were defective to some degree. For example, occasionally plants may die prematurely due to no fault of the customer. In such situation, to engender and maintain goodwill with their customers, the Debtors, in their discretion, may permit a customer to return or exchange such defective products. It is difficult to estimate with precision the aggregate amount of potential Product Return Claims for goods purchased prior to the Petition Date. Based on historical data, however, the Debtors estimate that Product Return Claims relating to products sold prepetition in cash refunds to customers would not exceed $150,000.

92.     The Debtors seek the entry of an order, authorizing, but not directing, the Debtors to continue to honor their obligations related to the Volume Rebates and the Product Return

Claims and any similar customer-related obligations (collectively, the "Customer Programs") and to honor prepetition commitments related thereto.

93.     I believe that honoring prepetition commitments under the Customer Programs will benefit the Debtors and their creditors by allowing the Debtors' operations to continue without interruption. In essence, the Debtors hope to continue during the postpetition period those Customer Programs that they believe were effective prepetition. I also believe that the relief requested by the Customer Programs Motion is necessary to preserve their customer relationships and goodwill for the benefits of their estates. The importance of the Debtors' customers to their business cannot be underestimated. The Debtors' Customer Programs have generated valuable goodwill and repeat business and have contributed to the Debtors' overall revenue. I believe that if the Debtors do not honor, in their discretion, their obligations under the Customer Programs, the Debtors risk alienating their customers and encouraging customers to procure products from the Debtors' competitors, all to the detriment of the Debtors and their business. The substantial benefit conferred on the Debtors by the Customer Programs justifies the granting of the relief requested in this Motion. Accordingly, I believe that the relief requested in the Customer Programs Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this __12__ day of October, 2010.

_____
Stephen Thigpen