# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:               ) | **Chapter 11** |
|                   ) | |
| **CONSOLIDATED HORTICULTURE**   ) | |
| **GROUP LLC,** *et al.,*[1]        ) | **Case No. 10-_____** |
|                   ) | |
|         **Debtors.**         ) | **Joint Administration Requested** |
|                   ) | |

## MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (B) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (C) AUTHORIZING USE OF CASH COLLATERAL, (D) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, AND (E) SCHEDULING A FINAL HEARING

The above-captioned debtors and debtors-in-possession (the "Debtors") file this motion

(the "Motion") for entry of an interim order (the "Interim Order"), substantially in the form

attached hereto as **Exhibit 1**,[2] and a final order (the "Final Order," and together with the Interim

Order, the "DIP Orders") (a) authorizing the Debtors to obtain secured postpetition financing in

the amount of up to $20,000,000 on a superpriority, "priming" basis (the "DIP Facility"), of

which the sum of $5,000,000 would be available on an interim basis pursuant to the Interim

Order and the terms and conditions of that certain Revolving Loan Promissory Note as the same

may be amended, supplemented, restated or otherwise modified from time to time (the "DIP

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of each Debtors' federal tax identification numbers are: Consolidated Horticulture Group LLC (2698); New Hines Parent Company LLC (9355); and Hines Nurseries LLC (2567). The location of the Debtors' headquarters and the service address for the Debtors is: 12621 Jeffrey Road, Irvine, California 92620.

[2] The terms of the attached Interim Order have been approved by the DIP Agent, the ABL Agent, the Term Loan Agent and the Sub Loan Agent (as defined below), subject to non-substantive changes. Capitalized terms used but not otherwise defined in this Motion shall have the meanings set forth in the the DIP Demand Note (as defined below) or the Interim Order, as applicable.

Demand Note") attached as Exhibit A to the Interim Order,[3] by and among Hines Nurseries LLC in its capacity as borrower ("Hines" or the "Borrower"), Consolidated Horticulture Group LLC and New Hines Parent Company LLC as guarantors (collectively, the "Guarantors"), Black Diamond Commercial Finance, L.L.C., as administrative agent (the "DIP Agent"), and the other lenders party thereto (each a "DIP Lender" and collectively, the "DIP Lenders"),[4] (b) granting the DIP Facility and all obligations owing thereunder to the DIP Agent and the DIP Lenders first priority security interests in and liens on all of the DIP Collateral (as defined below), (c) granting allowed superpriority expense claims to the DIP Agent and the DIP Lenders, (d) authorizing the use of the Term Loan Lenders' and the ABL Lenders' and the Subordinated Lenders' (collectively, the "Prepetition Lenders") cash collateral, (e) providing adequate protection for any diminution in value of the Prepetition Collateral (as defined below) to the Prepetition Lenders (including a partial roll-up of prepetition debt), (f) scheduling pursuant to Bankruptcy Rule 4001(c)(2) a final hearing (the "Final Hearing") to consider entry of a final order:[5]

## Jurisdiction

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3] Due to the shortness of time, the parties have agreed to fund loans under the Interim Order pursuant to the DIP Demand Note. It will be a condition precedent of the funding of any loans in excess of $5,000,000 that the Debtors execute and deliver a credit agreement in form and substance satisfactory to the DIP Agent.

[4] The DIP Lenders are expected to be affiliates of the DIP Agent. As disclosed further below, the DIP Agent and the DIP Lenders are affiliated with entities holding 100% of the equity interests in the Debtors and also hold a substantial portion of the Debtors' prepetition secured debt.

[5] The facts and circumstances supporting this Motion are set forth in the Declaration of Sandeep Gupta, Managing Director of FTI Consulting, Inc. and Chief Restructuring Officer of the Debtors. In addition, other facts and circumstances supporting this Motion are set forth in the Declaration of Stephen Thigpen, President and Chief Executive Officer of the Debtors, in Support of First Day Motions, filed contemporaneously herewith.

3.     The bases for the relief requested herein are sections 105, 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules").

### Background

4.     On the date hereof (the "Petition Date"), each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases, and no committees have been appointed or designated. Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of the Chapter 11 Cases.

5.     The Debtors operate one of the largest commercial nursery operations in North America, producing and distributing one of the broadest assortments of ornamental shrubs, color plants and container-grown plants in the industry. The Debtors sell their green goods to more than 1,180 retail and commercial customers, representing more than 6,670 outlets throughout the United States, including premium local and regional garden centers, as well as leading national home centers and retailers, such as The Home Depot, Lowe's and Wal-Mart.

6.     As of the Petition Date, the Debtors employed approximately 900 employees. The Debtors' employee base fluctuates seasonally from a low of approximately 850 to a high of

approximately 1,200 employees during the activity-intensive preparation and selling season from February to June (excluding temporary workers). None of the Debtors' employees are represented by a labor union. Hourly, salaried and contract labor comprise nearly 41% of the Debtors' production costs as of July 31, 2010.

7.    The Debtors produce approximately 5,100 varieties of ornamental shrubs, color plants, and container-grown plants grown primarily for outdoor use, most of which are sold under the Hines Nurseries trade name. The Debtors operate eight nurseries located in Arizona, California, Oregon and Texas.

8.    In 2009, the Debtors recorded net sales of approximately $123.5 million. In addition, for 2009, the Debtors reported approximately $173.8 million in total assets and approximately $64.4 million in total liabilities, including secured obligations under the Debtors' prepetition secured term and revolving credit facilities (collectively, the "Prepetition Credit Agreements").

9.    The Debtors had to file for chapter 11 relief due to significant declines in revenue. The Debtors' decline in revenue stems primarily from, among other things: (a) continued weak consumer demand for products in the Debtors' industry; (b) anemic homebuilding activity; (c) continued pricing pressure from certain of the Debtors' largest customers; (d) loss of revenues from business strategy changes from one of the Debtors' largest customers; and (e) inventory imbalances that lead to shortages of critical crops.

## The Debtors' Prepetition Credit Agreements

### I.  The Prepetition Revolving Loan.

10.  Before the commencement of the Debtors' Chapter 11 Cases, pursuant to that certain Loan and Security Agreement, dated as of January 9, 2009 (as amended, restated, supplemented or otherwise modified from time to time, the "ABL Credit Facility"), by and among Hines, as borrower, the financial institutions, as lenders (collectively, the "ABL Lenders"), and Bank of America, N.A., individually as a lender and as agent for the ABL Lenders (as the agent, the "ABL Agent"), the ABL Lenders[6] agreed to make certain loans and other financial accommodations to Hines, including a revolving credit facility in an aggregate amount of up to $78 million, with a $15 million letter of credit sub-limit.  Under the loan documents executed as of January 9, 2009 (as they have been amended, restated, supplemented or otherwise modified from time to time, together with the ABL Credit Facility, the "ABL Credit Facility Documents"), Hines granted to the ABL Agent, for the benefit of itself and the ABL Lenders under the ABL Credit Facility Documents, security interests in and liens upon substantially all of the property of Hines, including (but not limited to) all accounts, chattel paper (including electronic chattel paper), all commercial tort claims, all deposit accounts, all documents, all general intangibles (including intellectual property), all goods including inventory, equipment and fixtures, all instruments, all investment property, all letter-of-credit rights, and all supporting obligations, all monies, all accessions to, substitutions for, and all replacements, products and cash and non-cash proceeds of the foregoing, including proceeds of

---

[6] The ABL Lenders include BDCM Opportunity Fund II, L.P. and BDC Finance, L.L.C., affiliates of the DIP Agent and the DIP Lenders, who hold (in the aggregate) approximately 53% of the Revolver Commitments.

and unearned premiums with respect to insurance policies, and claims against any person for loss, damage or destruction of any collateral; and all books and records (including customer lists, files, correspondence, tapes, customer programs, print-outs and computer records) pertaining to the foregoing (collectively, the "Hines Prepetition Collateral").

11.     Pursuant to that certain Guaranty Agreement, also dated as of January 9, 2009 (as amended, modified, restated, reaffirmed or supplemented prior to the date hereof, the "Guaranty Agreement"), Hines Parent unconditionally guaranteed the obligations of Hines under the ABL Credit Facility Documents. To secure all obligations under the Guaranty Agreement and ABL Credit Facility Documents, Hines Parent executed that certain Security Agreement, also dated January 9, 2009 (as amended, modified, restated, reaffirmed or supplemented prior to the date hereof, the "Parent's Security Agreement"). In the Parent's Security Agreement, Hines Parent granted to the ABL Agent, for the benefit of the ABL Lenders, a security interest in and lien upon substantially all the property of Hines Parent (collectively, with the Hines Prepetition Collateral, the "Prepetition Collateral").

## II.     The Prepetition Term Loan.

12.     Pursuant to that certain Term Loan and Security Agreement, dated January 9, 2009 (as amended, restated, supplemented or otherwise modified from time to time, the "Term Loan Credit Facility"), by and among Hines, as borrower, the financial institutions, as lenders (collectively, the "Term Loan Lenders"), and Black Diamond Commercial Finance, L.L.C., as agent for the Term Loan Lenders[7] (the "Term Loan Agent"), the Term Loan Lenders agreed,

---

[7] The Term Loan Lenders are BDCM Opportunity Fund II, L.P. and BDC Finance, L.L.C., affiliates of the DIP Agent and the DIP Lenders.

subject to the terms and conditions set forth in the Term Loan Credit Facility, to loan Hines the principal amount of $8.0 million.

## III.    The Prepetition Subordinated Loan

13.    Pursuant to that certain Subordinated Loan and Security Agreement, also dated January 9, 2009 (as amended, restated, supplemented or otherwise modified from time to time, the "Sub Loan Credit Facility"), by and among Hines, as borrower, the financial institutions, as lenders (collectively, the "Sub Loan Lenders"),[8] and Black Diamond Commercial Finance L.L.C., as agent for the Sub Loan Lenders (the "Sub Loan Agent"), the Sub Loan Lenders agreed, subject to the terms and conditions set forth in the Sub Loan Credit Facility, to loan Hines $10.0 million.

14.    To secure all obligations under the Term Loan Credit Facility and the Sub Loan Credit Facility (collectively, as amended, restated, supplemented or otherwise modified from time to time, the "Term Loan and Sub Loan Credit Facilities"), Hines granted to the Term Loan Agent, for the benefit of the Term Loan Lenders and the Sub Loan Agent, for the benefit of the Sub Loan Lenders (collectively, the "Term Loan and Sub Loan Lenders") a security interest in and lien upon substantially all of the Prepetition Collateral; provided, however, that (a) the liens and security interests of the ABL Lenders and the Term Loan Lenders are subject to that certain Intercreditor Agreement, dated January 9, 2009 (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), by and among, (i) Hines, as borrower, (ii) the ABL Agent, on behalf the ABL Lenders, and (iii) the Term Loan Agent, on

---

[8] The Sub Loan Lenders are BDCM Partners I, L.P., BDCM Opportunity Fund II, L.P. and BDC Finance Intermediate Corp. (CHG), affiliates of the DIP Agent and the DIP Lenders.

behalf of the Term Loan Lenders, and (b) the liens and security interests of the Sub Loan Lenders are subject to that certain Subordination and Intercreditor Agreement, also dated January 9, 2009 (as amended, restated, supplemented or otherwise modified from time to time, the "Subordination Agreement"), by and among (i) Hines, as borrower, (ii) the ABL Agent, on behalf of the ABL Lenders, (iii) the Term Loan Agent, on behalf of both the Term Loan Lenders, and (iv) the Sub Loan Agent, for the benefit of the Sub Loan Lenders. Pursuant to the Intercreditor Agreement, (x) the Term Loan Agent, for the benefit of the Term Loan Lenders, has a senior lien on the Term Loan Primary Collateral[9] (primarily including real property and fixed assets) and a junior lien on the ABL Primary Collateral, and (y) the ABL Agent, for the benefit of the ABL Lenders, has a senior lien on the ABL Primary Collateral (primarily including inventory and accounts receivables) and a junior lien on the Term Loan Primary Collateral. Pursuant to the terms of the Subordination Agreement, the liens and security interests granted to the Sub Loan Agent for the benefit of the Sub Loan Lenders are subordinated to the liens and security interests granted to the Term Loan Agent for the benefit of the Term Loan Lenders and the ABL Agent for the benefit of the ABL Lenders.

15.    As of the Petition Date, Hines and Hines Parent are indebted to (a) the ABL Lenders in the amount of not less than $48,565,895.30 (plus interest, fees and expenses to the extent provided in the facility), (b) the Term Loan Lenders in the amount of not less than $8,000,000.00 (plus interest, fees and expenses to the extent provided in the facility), and (c) the Sub Loan Lenders in the amount of not less than $16,781,451.42 (plus interest, fees and

---

[9]    Certain capitalized terms in this paragraph used but not otherwise defined by the DIP Demand Note or the Interim Order shall have the meanings set forth in the Intercreditor Agreement.

expenses to the extent provided in the facility). The aggregate due on the Prepetition Credit Agreements, as of the Petition Date, is approximately $71,367,346.72 (collectively, the "Prepetition Indebtedness").

16.     The DIP Facility will be senior to, and will "prime," the Prepetition Indebtedness on a consensual basis. At this time, such consent has been obtained for purpose of entry of the proposed Interim Order, and is subject to the reservation of rights contained in paragraph 46 of the Interim Order.

### Debtors' Relationship with Black Diamond

17.     The ultimate holders of the entirety of the Debtors' equity interests, and a substantial portion of the Prepetition Indebtedness, are affiliates of the DIP Agent and the DIP Lenders. Specifically, affiliates of the DIP Agent and the DIP Lenders hold approximately 53% of the outstanding obligations under the ABL Credit Facility, and the entirety of the obligations under both the Term Loan Credit Facility and the Sub Loan Credit Facility. Affiliates of the DIP Agent and the DIP Lenders also have other claims against the Debtors.

18.     In large part as a result of the foregoing connections, the DIP Agent and the DIP Lenders are willing to advance further funds to the Debtors on the terms of the DIP Facility in order to allow these estates to maximize the value of their assets for the benefit of all constituents.

### FTI Consulting

19.     In August 2010, the Debtors retained FTI Consulting, Inc. ("FTI") to provide the Debtors with certain financial advisory and consulting services. The Debtors also engaged

Sandeep Gupta, a senior managing director of FTI, in the capacity of Chief Restructuring Officer.

20.     Since that time, FTI and Mr. Gupta have worked to provide the Prepetition Lenders with budgets, projections and other information regarding the current Debtors' business operations and projections based on various models and assumptions. At the same time, FTI and Mr. Gupta have attempted to implement systems to enhance the near and long term profitability of the Debtors, and have assisted in negotiating the terms of the DIP Facility.

## Need for the DIP Facility and Use of Cash Collateral

21.     The Debtors have an immediate and critical need to obtain postpetition financing under the DIP Facility and to use cash collateral. The Debtors' access to sufficient working capital and liquidity through the incurrence of postpetition financing under the DIP Facility and the use of cash collateral is vital to maximizing the value of the Debtors' estates. Consequently, without access to the DIP Facility and the continued use of cash collateral, the Debtors and their estates would suffer immediate and irreparable harm because they could not continue to operate.

22.     The use of cash collateral alone would be insufficient to meet the Debtors' postpetition liquidity needs. The Debtors are unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the Bankruptcy Code or (b) under section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured by (x) a senior lien on unencumbered assets of the Debtors' estates under section 364(c)(2) of the Bankruptcy Code and (y) a junior lien on encumbered assets under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code from sources other than the DIP

Lenders on terms more favorable than the terms of the DIP Facility. The only source of secured credit available to the Debtors, other than the use of cash collateral, is the DIP Facility. The Debtors require both additional financing under the DIP Facility and the continued use of cash collateral in order to satisfy their postpetition liquidity needs.

23. The DIP Lenders have indicated a willingness to provide the Debtors with certain financing commitments, but solely on the terms and conditions set forth in the DIP Demand Note and the Interim Order. After considering all of their alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the financing to be provided by the DIP Lenders pursuant to the terms of the DIP Demand Note and the Interim Order represents the best financing presently available to the Debtors.

24. The Debtors have negotiated the DIP Facility and the DIP Demand Note in good faith and at arm's-length with the DIP Agent. The Debtors believe that the terms of the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. Moreover, the Prepetition Lenders have consented, on an interim basis only, to the terms of the DIP Facility including the use of Cash Collateral and the priming of their liens. The Prepetition Lenders' consent to the DIP Facility is limited to that portion of the facility that the Debtors seek to have approved in the Interim Order, and is subject to a reservation of rights described at paragraph 46 of the proposed Interim Order approving the DIP Facility. Pursuant to such reservation of rights, the Prepetition Lenders expressly reserve all of their rights with

respect to any Final Order on the Financing Motion, including the right to seek, or condition their consent upon, additional adequate protection provisions.

## **Summary of Principal Terms of the DIP Facility**

25.     The following is a summary of the key terms of the DIP Facility:

26.     The DIP Facility consists of a postpetition revolving credit facility in an aggregate principal amount of up to $20,000,000 (the "DIP Commitment"), of which an aggregate principal amount of $5,000,000, will be available on an interim basis as set forth in the DIP Demand Note and the Interim Order.

27.     The Debtors' obligations under the DIP Facility (the "DIP Obligations") are to be secured by valid and perfected first priority liens and security interests, subject only to (a) Permitted Priority Liens (as set forth in the Demand Note), and (b) the Carve-Out.[10]   The collateral for the DIP Facility is all of the assets of the Debtors' estates, including the Prepetition Collateral and, subject to the entry of the Final Order, Avoidance Actions (collectively with all proceeds and products of any or all of the foregoing, the "DIP Collateral").

---

[10]   The "Carve-Out" is defined in the DIP Facility as an amount equal to the sum of (a) the statutory fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6); (b) fees payable to the Clerk of the Bankruptcy Court; (c) subject to the terms and conditions of the Interim Order and the Budget, the unpaid and outstanding reasonable fees and expenses actually incurred on or after the Petition Date and prior to the occurrence of an Event of Default under the DIP Loan Documents or other Termination or Maturity Date under the Interim Order, the Final Order or the DIP Loan Documents (including the DIP Demand Note), to the extent allowed and payable under sections 326, 328, 330 and 331 of the Bankruptcy Code (but excluding success, completion or other transaction fees) and any interim procedures order by attorneys, accountants and other professionals retained by the Debtors and any Committee under sections 327 or 1103(a) of the Bankruptcy Code (the "Professionals"); and (d) the unpaid and outstanding reasonable fees and expenses actually incurred from or after the occurrence of an Event of Default, or other Termination or Maturity Date under the Interim Order, the Final Order or the DIP Loan Documents (including the DIP Demand Note) to the extent allowed and payable under sections 326, 328, 330, and 331 of the Bankruptcy Code (but excluding success, completion or other transaction fees) and any interim procedures order, by the Professionals in an aggregate amount not to exceed $250,000.

28. The following is a summary of the terms of the DIP Facility:[11]

| | |
|---|---|
| Borrower: | Hines Nurseries LLC. |
| Guarantor(s): | Consolidated Horticulture Group, LLC and New Hines Parent Company LLC |
| Agent: | Black Diamond Commercial Finance, L.L.C. |
| DIP Lenders: | Black Diamond Capital Management, LLC and/or affiliates thereof ("BDCM") shall agree to provide the DIP Facility. The opportunity to participate pro rata in the DIP Facility will be offered to the existing ABL Lenders. |
| Closing Date: | The date the initial loans are available to be made under the DIP Facility (not later than one (1) day after the Bankruptcy Court issues an interim order approving the DIP Facility). |
| Type and Amount: | A superpriority senior secured debtor in possession revolving credit facility to the Borrower and the Guarantors as debtors and debtors in possession in the Chapter 11 Cases in an aggregate principal amount of up to US$20,000,000. |
| Availability: | In accordance with the DIP Demand Note, up to US$5,000,000 of the DIP Facility will be available for draw on the Closing Date after the entry of the Interim Order approving the DIP Facility. The remainder of the $20,000,000 commitment will be available for draw after the entry of the Final Order approving the DIP Facility. All draws under the DIP Facility shall be subject to the prior satisfaction of all conditions precedent, as well as compliance with the Budget (as defined below) approved by the DIP Agent. Once approved by the Final Order, the loans under the DIP Facility will be made on a revolving basis during the period commencing on the Closing Date and ending on the earlier of the following (such date, the "Maturity Date"): (i) the date that is 180 days after the Closing Date, (ii) the date upon which the sale of substantially all of the Borrower's assets is consummated, (iii) the date on which the Borrower confirms a plan under Chapter 11 of the Bankruptcy Code, (iv) the date on which the Borrower's Chapter 11 Case is converted to a case under Chapter 7 of the Bankruptcy Code, (v) the date of the acceleration of the loans and the termination of the commitments as provided for in the DIP Facility; and (vi) the date on which the Borrower voluntarily prepays all obligations under the DIP Facility in full.[12] |

---

[11] This summary of the DIP Facility and the Interim Order is provided for the benefit of the Court and other parties in interest. To the extent there are any conflicts between this summary and the Interim Order or the DIP Demand Note, the terms of the Interim Order or DIP Demand Note shall govern, as applicable. At this time, the DIP Demand Note reflects the interim financing request in the amount of $5,000,000. The Debtors expect to submit documentation reflecting the expected $20,000,000 DIP Facility in advance of the hearing on the Final Order. To the extent this description contains terms not reflected in the DIP Demand Note or the Interim Order, such items reflect the expected terms of the final DIP Facility.

[12] In accordance with the interim nature of the DIP Demand Note, such note contains a modified definition of "Maturity Date," which, among other things, provides for maturity 30 days after entry of the Interim Order.

DOCS_DE:164441.4

| Purpose: | The loans under the DIP Facility (the "DIP Loans") shall be used (i) to pay fees and expenses associated with the DIP Facility, (ii) for cash collateralization of letters of credit provided by third-party issuers, and (iii) for working capital and other corporate purposes, including expenses of the Chapter 11 Cases, of the Borrower. Proceeds under the DIP Facility shall be available to the Borrower solely pursuant to a weekly budget containing detailed line-item receipts and expenditures (the "Budget"). The Budget will be subject to the approval of the DIP Agent in its sole discretion. |
|---|---|
| Cash Management: | The Debtors shall maintain current cash management with institution of daily sweeps upon default or Event of Default at the DIP Agent's discretion. |
| Security: | All borrowings and reimbursement and other obligations under the DIP Facility shall at all times be secured by the liens and claims set forth below, subject in each case to the Carve-Out: |

(i) pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority claim status in the Chapter 11 Cases;

(ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all unencumbered property and assets of the Borrower and the Guarantors;

(iii) pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all property and assets of the Borrower and the Guarantors that are subject to valid and perfected liens in existence at the time of the commencement of the Chapter 11 Cases or to valid liens in existence at the time of such commencement as permitted by Section 546(b) of the Bankruptcy Code, (other than with respect to the liens described in clause (iv) below); and

(iv) pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority, senior priming lien (the "Priming Lien") on all assets of the Borrower and the Guarantors to be granted to the DIP Agent (including, upon the Final Order, Avoidance Actions), which Priming Lien shall (for the avoidance of doubt) prime any lien existing prior to the Petition Date or arising on or after the Petition Date, including (without limitation) the liens of (x) the ABL Agent, (y) the Term Loan Agent, and (z) the Sub Loan Agent on the Prepetition Collateral. The Priming Lien shall be subject only to (1) Permitted Priority Liens (as set forth in the DIP Demand Note) and (2) the Carve-Out.[13]

Notwithstanding the foregoing, so long as a default or an Event of Default shall not have occurred and be continuing, the Borrower shall be permitted to pay compensation and reimbursement of expense allowed and payable under 11 U.S.C. § 330 and 331, as the same may be due and payable, subject to and in accordance with the Budget.

---

[13] The terms of the Carve-Out are described in greater detail at paragraphs 12-14 of the proposed Interim Order.

| | |
|---|---|
| <u>Partial Roll-Up of</u><br><u>ABL Credit Facility:</u> | For each dollar of the Debtors' postpetition cash collections, including cash collections during the term of the Interim Order (which will be expended either as Cash Collateral or applied to the DIP Obligations as provided in the Interim Order and any Final Order), an equivalent amount of Prepetition Indebtedness owed under the ABL Credit Facility shall be deemed to have been repaid and re-borrowed on a postpetition basis, so that such amount shall be deemed to be postpetition indebtedness advanced by the ABL Agent on behalf of the ABL Lenders pursuant to sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code, secured by the DIP Collateral but subject and subordinate to the DIP Obligations and the Postpetition Liens (the "Roll Up"). Notwithstanding the foregoing, in no event shall the aggregate amount of the Roll Up exceed the lesser of (i) actual collections received by the Debtors on account of ABL Primary Collateral in existence as of the Petition Date, including proceeds thereof, and (ii) the allowed amount of the secured claim of the ABL Lenders as determined in accordance with section 506 of the Bankruptcy Code. Notwithstanding anything to the contrary set forth herein, the indebtedness evidenced by the Roll Up shall in all respects be and remain subject to the terms of the Intercreditor Agreement as if no such roll up had occurred. During the pendency of the Interim Order, the Debtors expect to utilize approximately $3.5 million of postpetition cash collections, which would be subject to the Roll-Up. |
| <u>Adequate Protection:</u> | As adequate protection in respect of any diminution in the value of the Prepetition Collateral resulting from the incurrence of the DIP Obligations, the use of Cash Collateral or the granting of the Postpetition Liens, the Prepetition Agents and the Prepetition Lenders will be granted (in each case subject to the Postpetition Liens and the Carve-Out) the following ((a) through (c) below shall be referred to collectively as the "Adequate Protection Obligations"):<br><br>(a)      Adequate Protection Liens. The Prepetition Agents for the benefit of the Prepetition Lenders will be granted valid, perfected, postpetition security interests in and liens (the "Replacement Liens") on any and all of the assets of the Debtors including those that fall within the definition of Prepetition Collateral and DIP Collateral, provided, however, that, notwithstanding anything to the contrary, the Replacement Liens shall be and remain subject and subordinate to (i) the Postpetition Liens and/or payment of any DIP Obligations on account thereof, (ii) Permitted Priority Liens (as set forth in the DIP Demand Note), (iii) permitted liens entitled to priority over the Prepetition Indebtedness to the extent provided in the Prepetition Credit Agreements, and (iv) payment of the Carve-Out. The rights of the Prepetition Agents in respect of the Replacement Liens shall be governed by the Intercreditor Agreement and, in the case of the Sub Loan Agent, the subordination provisions of the Sub Loan Credit Facility.<br><br>(b)      Adequate Protection Superpriority Claims. As further adequate protection, the Prepetition Agents and the Prepetition Lenders will be granted a superpriority claim with priority over all administrative expense claims and unsecured claims against the Debtors or their estates (the "Adequate Protection Superpriority Claim"). The Adequate Protection Superpriority Claim shall at all times be subordinate to the Superpriority |

Claim and the Carve-Out.

(c)     Current Cash Payments. As further adequate protection, the Debtors shall make monthly interest payments to (i) the ABL Agent, for the benefit of the ABL Lenders, in an amount equal to the default interest that would have been payable for such month on account of the Obligations (as defined in the ABL Credit Facility), calculated and payable in the manner set forth in Sections 3.1.1(a), 3.1.1(b), 3.1.1(c)(i) and 3.3 of the ABL Credit Facility; and (ii) the Term Loan Agent, for the benefit of the Term Loan Lenders, in an amount equal to the default interest that would have been payable for such month on account of the Obligations (as defined in the Term Loan Credit Facility), calculated and payable in the manner set forth in Sections 3.1.1(a), 3.1.1 (b), 3.1.1(c) and 3.3 of the Term Loan Credit Facility. Each of the ABL Agents, the ABL Lenders, the Term Loan Agent and the Term Loan Lenders request the right to seek payment of the default rate of the interest as set forth in the ABL Credit Facility and the Term Loan Credit Facility, respectively.

(d)     Payment of fees and expenses. Notwithstanding anything to the contrary in the Budget, the Debtors shall promptly pay (i) the administration fee payable to the ABL Agent pursuant to Section 3.2 of the ABL Credit Facility, and (ii) the reasonable legal fees and expenses of the ABL Agent and the Term Loan Agent, to the extent provided in the ABL Credit Facility and Term Loan Facility, respectively, upon the submission of appropriate written invoices, provided that the Debtors' obligation under clause (ii) hereof shall be limited to the payment of one regular outside counsel and one local counsel for each of the ABL Agent and the Term Loan Agent.

| | |
|---|---|
| Interest Rate: | The DIP Loans will bear interest at the rate of 12.00% *per annum* calculated on the basis of the actual number of days elapsed in a 360-day year and payable monthly in arrears (the "Interest Rate").<br><br>Borrowings will require one business day's prior notice and will be in minimum amounts to be agreed upon. |
| Default Interest: | 2.00% *per annum* plus the Interest Rate. Default Interest shall be payable on demand. |
| Unused Line Fee: | An unused line fee equal to 2.00% *per annum* on the average unused portion of the DIP Commitment available for borrowing from time to time. Accrued unused line fees will be payable monthly in arrears (calculated on a 360-day year basis) for the benefit of the DIP Lenders from the Closing Date. For the avoidance of doubt, the unused line fee will be calculated on the basis of a $5,000,000 DIP Commitment from the date on which the interim order approving the DIP Facility is entered until the date on which the final order approving the DIP Facility is entered, and on the basis of a $20,000,000 DIP Commitment thereafter. |
| Interest Payments: | Monthly in arrears. |
| Fees: | Initial Fee – none.<br><br>Administrative Fee – a fee equal to the monthly administrative fee payable under the ABL Credit Facility to the administrative agent thereunder to be |

paid to the DIP Agent, for the benefit of the DIP Agent, per month with the first such Administrative Fee to be paid upon the entry of the Interim Order and, thereafter, on the first of each month.

Reduction Fee – Prior to entry of the Final Order, no Reduction Fee will be payable. From and after entry of the Final Order, one or more Reduction Fees equal to 5.00% of the amount of any permanent reduction, in whole or in part, of the DIP Commitment to be paid to the DIP Agent, for the benefit of the DIP Lenders, upon such permanent reduction of the DIP Commitment.

Exit Fee – Prior to entry of the Final Order, no Exit Fee will be payable. From and after entry of the Final Order, an Exit Fee equal to 5.00% of the amount of the DIP Commitment (calculated as of the Maturity Date, taking into account any permanent reductions made prior thereto) to be paid to the DIP Agent, for the benefit of the DIP Lenders, upon the Maturity Date. Payment of any Exit Fee (if due) is in place of, and shall not be duplicative of or cumulative with, a Reduction Fee.

All fees payable to the DIP Agent shall be fully earned on the date such payment is due and shall be non-refundable.

| | |
|---|---|
| <u>Voluntary Prepayments:</u> | Permitted in whole or in part, with prior notice but without premium or penalty (other than the Reduction Fee and the Exit Fee described above). Each partial prepayment shall be in an amount that is an integral multiple of US$100,000 and not less than US$250,000. |
| <u>Mandatory Prepayments and Commitment Reductions:</u> | Customary provisions to repay debt in the event of asset dispositions outside the ordinary course. |
| <u>Representations and Warranties:</u> | Customary and appropriate for financings of this type, and such other representations and warranties as the DIP Agent may require, including without limitation due organization and authorization, enforceability, financial condition, no material adverse changes, title to properties, no liens, no litigation, payment of taxes, compliance with laws and regulations, no employee benefit liabilities, no environmental liabilities, perfection and priority of liens securing the DIP Facility and superpriority status, continued effectiveness of financing orders and full disclosure. |
| <u>Covenants:</u> | Customary and appropriate affirmative, negative and financial covenants for financings of this type, and such other covenants as the DIP Agent may require, including without limitation, the financial covenants set forth below and the delivery of certain notices and financial statements, including without limitation rolling weekly financial reporting. |

The Debtors shall comply with the Budget in all respects, provided however, that the Debtors shall be deemed to be in compliance with the Budget so long as (i) aggregate receipts are not less than 85% of the aggregate receipts projected in the Budget, and (ii) disbursements are not greater than 110% of the disbursement projected in the Budget, in each case tested weekly on a line item basis and cumulatively for the immediately preceding four week period (or from the Petition Date to the

DOCS_DE:164441.4

extent such period is less than four weeks).

| | |
|---|---|
| Events of Default: | Customary Events of Default, as reflected in paragraph 15 of the DIP Demand Note and paragraph 17 of the proposed Interim Order, and as customary and appropriate for financings of this type and such other covenants as the DIP Agent may require (subject to such grace periods as the DIP Agent may agree), including without limitation failure to make payments when due, defaults under other agreements or instruments of indebtedness, noncompliance with covenants, breaches of representations and warranties, judgments in excess of specified amounts, impairment of security interests in collateral, failure of the Bankruptcy Court to have entered an interim order approving the DIP Facility, failure by the Bankruptcy Court to enter a final order confirming the interim order within thirty (30) days after entry of the interim order, the interim order shall have been stayed, amended, modified, reversed or otherwise determined not to be a binding or valid obligation of the Borrower or the Guarantors, a default under the terms of the Interim Order shall have occurred and be continuing.  In addition, it will be an event of default under the DIP Facility if: |

(a)    Hines has not transmitted to the DIP Agent and the Prepetition Agents (and the DIP Agent has not received) a final version of the Hines' business strategy and plan on a go-forward basis on or before October 29, 2010, in form and substance acceptable to the DIP Agent in its sole and absolute discretion.

(b)    Hines has not received from Hines' top three customers (as determined by the DIP Agent in its sole and absolute discretion), by the thirtieth (30th) day following the Petition Date, adequate assurance that such customers will continue to do business with Hines during 2011 at business levels consistent with the proposed business levels for 2011 that were recently conveyed to Hines, and Hines has not transmitted to the DIP Agent and the Prepetition Agents (and the DIP Agent has not received) proof of such adequate assurance in form and substance acceptable to the DIP Agent in its sole and absolute discretion.

| | |
|---|---|
| Conditions Precedent to Initial Funding: | Customary and appropriate for financings of this type, including entry of the Interim Order approving the DIP Facility. For the avoidance of doubt, the interim and final orders approving the DIP Facility, as well as the definitive documentation in connection with the DIP Facility, must be in form and substance acceptable to the  DIP Agent. |
| Condition Precedent to Funding of Loans in Excess of $5,000,000: | Entry of the Final Order approving the DIP Facility, and receipt by the DIP Agent of (a) a credit agreement in form and substance satisfactory to the DIP Agent and containing terms consistent with those set forth herein and in the DIP Demand Note, (b) a final version of the Hines' business strategy and plan on a go-forward basis, in form and substance acceptable to the  DIP Agent in its sole and absolute discretion. |
| Conditions to All Borrowings: | In addition to the conditions precedent to the initial funding of the DIP Facility, the conditions to all borrowings will include consistency with the budget then in effect, requirements relating to prior written notice of borrowing, the accuracy of representations and warranties, and the absence |

of any event of default or potential event of default.

Expenses and
Indemnification:

The Borrower shall pay all reasonable out-of-pocket expenses of the DIP Agent and DIP Lenders, including, but not limited to, legal, appraisal, field examination and environmental survey fees, and all expenses related thereto, associated with (i) the arrangement, syndication and funding of the DIP Facility, (ii) the preparation, negotiation, execution, delivery and ongoing administration of the DIP Facility, and any amendments, waivers, modifications, supplements, restructurings, refinancings and "workouts" with respect thereto, and the creation, perfection and perfection of liens granted thereunder (including all search expenses and filing fees and taxes), (iii) the Chapter 11 Cases, and (iv) the enforcement of the rights and remedies of the DIP Agent and/or the DIP Lenders thereunder.

The Borrower shall indemnify and hold harmless the DIP Agent, and each DIP Lender and each of their respective affiliates, directors, officers, agents, attorneys and employees (each an "Indemnified Party") from and against any and all losses, claims, damages, liabilities and other expenses in a manner customary for financings of this type, excluding any gross negligence or willful misconduct.

Amendments,
Consents, Waivers,
and Modifications:

The Debtors, with the express written consent of the DIP Agent, may enter into any amendments, consents, waivers or modifications to the DIP Demand Note or the DIP Loan Documents without the need for further notice and hearing or any order of this Court, provided, however, that the Debtors shall provide the United States Trustee, counsel for each of the Prepetition Agents and counsel to any Committee appointed in these cases with three (3) business days advance notice (which may be provided through electronic mail) of their intent to enter into any material amendments, consents, waivers or modifications to the DIP Loan Documents. Unless the United States Trustee, a Prepetition Agent or the Committee shall object in writing to such amendment, consent, waiver or modification prior to the expiration of the three (3) business day period, such amendment, consent, waiver or modification shall become effective in accordance with its terms without further order of the Court.

Validation of
Liens/Investigation
Period:

The Debtors will stipulate as part of the Interim Order, subject to certain challenge rights noted below, that the Prepetition Liens constitute valid, binding, enforceable, and perfected liens with priority over any and all other liens (other than liens permitted by the terms of the documents governing the Prepetition Indebtedness) and are not subject to any challenge or defense, including, without limitation, respectively, avoidance, reduction, recharacterization, subordination (whether equitable, contractual or otherwise), claim, counterclaim, cross-claim, offset, defense or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity. The Debtors will further waive, discharge and release any right they may have to challenge the Prepetition Indebtedness, the Prepetition Liens or the Prepetition Collateral and the security for these obligations and to assert any offsets, defenses, claims, objections, challenges, causes of action and/or choses of action against the Prepetition Agents or the Prepetition Lenders (or any of them). Notwithstanding anything herein or in the DIP Loan Documents to the contrary, (i) from the date of appointment of a Committee through the

sixtieth (60th) day thereafter with respect to the Committee or (ii) seventy-five (75) days from the date of entry of the Interim Order with respect to any other party in interest, the Committee or any party in interest with the requisite standing, other than the Debtors, shall be entitled to investigate the validity, perfection, enforceability, and extent of the Prepetition Indebtedness and Prepetition Liens and any potential claims of the Debtors or their estates against the Prepetition Lenders arising from the Prepetition Indebtedness.

| | |
|---|---|
| Taxes, Reserve Requirements and Indemnities: | All payments are to be made free and clear of any present or future taxes (other than franchise taxes and taxes on overall net income), imposts, assessments, withholdings, or other deductions whatsoever. |
| Governing Law and Jurisdiction: | The Borrower and the Guarantors will submit to the exclusive jurisdiction of the Bankruptcy Court and will waive any right to trial by jury. New York law shall govern the definitive loan documents. |
| Consents: | The ABL Agent, on behalf of the ABL Lenders, the Term Loan Agent, on behalf of the Term Loan Lenders, and the Sub Loan Agent, on behalf of the Sub Loan Lenders, consent to the Debtors' use of Cash Collateral, the execution and delivery by the Debtors of the DIP Facility, the granting of the liens and claims contemplated thereby, and the performance by the Debtors of their obligations thereunder, subject to the reservation of rights contained in paragraph 46 of the proposed Interim Order. |
| Modification of Automatic Stay: | Pursuant to paragraph 18 of the proposed Interim Order, the automatic stay of Bankruptcy Code §362 is modified to allow the DIP Agent and DIP Lenders to take certain actions in connection with the DIP Facility, including upon the occurrence of an Event of Default. If the DIP Agent or the DIP Lenders elect to enforce their liens or security interests or exercise any other default-related remedies under applicable non-bankruptcy law pursuant to a non-judicial process or in a forum other than this Court, then the Prepetition Agents and the Prepetition Lenders shall automatically be granted relief from the automatic stay for the purpose of participating as junior lien creditors in any such action or proceeding, provided, however, under such circumstances, that neither the Prepetition Agents nor the Prepetition Lenders may (i) initiate or commence any such action or proceeding or (ii) in any way seek to enjoin, stay, hinder, or delay any such action or proceeding. Further, the automatic stay pursuant to section 362 of the Bankruptcy Code, to the extent applicable, shall be deemed terminated to allow the ABL Agent to apply funds held in internal accounts as collateral (which funds shall not constitute Cash Collateral or DIP Collateral unless and until remitted to the Debtors) toward (i) any liability for letters of credit drawn post-petition, (ii) any liability for the Debtors' credit card balances, and (iii) payment of the ABL Agent's professional fees and expenses (subject to compliance with Section 11(d) of the Interim Order). |
| Right to Purchase DIP Obligations: | Upon the occurrence and during the continuance of an Event of Default, and subject to certain notice requirements, the ABL Agent shall have thirty (30) days to consummate a purchase of all (but not less than all) of the DIP Obligations from the DIP Agent and DIP Lenders (the "Buy-Out Option"). The ABL Agent's right to exercise the Buy-Out Option shall be |

conditioned upon (i) the delivery to the DIP Agent, for the benefit of the DIP Lenders, of immediately available funds in an amount equal to the aggregate amount of the DIP Obligations then outstanding (including, without limitation, all principal, interest, fees, costs and expenses), (ii) the replacement of the DIP Agent with the ABL Agent (or its designee) (the "Replacement DIP Agent") and (ii) the subordination by the Replacement DIP Agent in its capacity as DIP Agent, of the Postpetition Liens on the Term Loan Primary Collateral to the prior payment in full in cash of the Obligations under the Term Loan Credit Facility. Notwithstanding the Buy Out Option outlined above, nothing in the Buy Out Option or the Interim Order shall preclude the DIP Agent or the DIP Lenders from exercising any or all of the rights or remedies available to them under the DIP Loan Documents or the Interim Order during the period preceding the ABL Agent's exercise of the Buy-Out Option, in connection with the occurrence of an Event of Default.

29.     The proceeds from the DIP Facility will be used by the Debtors in accordance with the terms of the DIP Orders to fund working capital needs and general corporate purposes, including expenses of the Chapter 11 Cases, relating to post-petition operations in substantial accordance with the Budget.

## **Relief Requested**

30.     The Debtors seek entry of the DIP Orders granting the following relief:

(a)     authorizing the Debtors to execute and deliver the DIP Demand Note and obtain up to $5,000,000 of secured postpetition loans, advances, and other financial accommodations pursuant to the Interim Order;

(b)     granting allowed superpriority expense claims to the DIP Agent and the DIP Lenders pursuant to section 364(c)(1) of the Bankruptcy Code;

(c)     granting the DIP Facility to the DIP Agent and the DIP Lenders first priority security interests in, and liens on, all of the DIP Collateral pursuant to section 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code;

(d)     approval of the form and manner of adequate protection to be provided to the DIP Lenders and the Prepetition Lenders pursuant to sections 361(a) and 363(c) of the Bankruptcy Code;

(e)     authorizing the Debtor to use the Cash Collateral pursuant to sections 361 and 363 of the Bankruptcy Code;

DOCS_DE:164441.4

(f)     authorizing a dollar-for-dollar roll-up of the prepetition ABL Credit Facility to the extent of the Debtors' postpetition cash collections (which will be expended either as Cash Collateral or applied to the DIP Obligations as provided in the Interim Order and any Final Order), and

(g)     modifying the automatic stay to the extent necessary to effectuate the provisions of the DIP Orders.

## Basis for Relief

## I.     The Debtors Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364(c) and 364(d)(1) of the Bankruptcy Code.

31.     Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtors seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section, 503(b)(l) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).  In addition, section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by "priming" liens, provides that the Court, after notice and a hearing, may:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if --
>
> (A) the [debtor] is unable to obtain credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(l).

32.     In evaluating proposed postpetition financing under sections 364(c) and (d) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether:

> (a)     unencumbered credit or alternative financing without superpriority status is available to the debtor;

(b)     the credit transactions are necessary to preserve assets of the estate;

(c)     the terms of the credit agreement are fair, reasonable, and adequate;

(d)     the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and its creditors; and

(e)     the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g.*, *In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

33.     For the reasons discussed below, the Debtors satisfy the standards required to access postpetition financing on a secured superpriority and priming lien basis under sections 364(c) and 364(d) of the Bankruptcy Code.

**A.     The Debtors Were Unable to Obtain Financing On More Favorable Terms.**

34.     The Debtors face severe liquidity restraints and were forced to file these Chapter 11 Cases to preserve the value of their assets. Although the Debtors' immediate need for liquidity and the extreme urgency of the situation prevented the Debtors from undertaking prior to the Petition Date an extensive marketing effort to obtain proposals for debtor in possession financing, limited inquiries to third parties have not yielded any prospect of alternative financing as yet. Indeed, without the agreement of the Debtors' existing prepetition lender, Black Diamond Commercial Finance, L.L.C., to provide the Debtors with postpetition financing, the

Debtors would have been unable to continue to fund payroll and meet other ordinary course obligations, resulting in a shutdown of the business, the termination of all employees, and the forced liquidation of all assets. In the absence of immediate approval of the DIP Financing and use of Cash Collateral on an interim basis, the Debtors will have no choice but to immediately discontinue operations, resulting in immediate and irreparable harm to the Debtors, their creditors and their estates.

35.    Based on current market conditions, the Debtors and FTI believe they would not have been successful in obtaining financing on terms more favorable than these presented here. However, under the existing DIP Facility, the Debtors will have another opportunity to test the market prior to entry of the Final Order without incurring any additional expense to the estate.

36.    Specifically, under the current DIP Facility, the Debtors are not being charged any up front commitment or other fees, and the Debtors will not be obligated to pay either any Exit Fee or Reduction Fee until after the entry of the Final Orders. Accordingly, the Debtors will have the opportunity to solicit additional offers of third party financing without any penalty being borne by the Debtors' estates. The Debtors respectfully submit that their efforts to obtain postpetition financing therefore satisfy the standard required under Section 364(c). *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re Sky Valley, Inc.*, 100 B.R.

107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

**B.      The DIP Facility is Necessary to Preserve the Assets of the Debtors' Estates.**

37.      As debtors in possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets. *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004). As noted above, the Debtors require access to working capital in the form of postpetition financing. Absent the additional working capital, the Debtors would be forced to liquidate.

**C.      The Terms of the DIP Facility Are Fair, Reasonable, and Appropriate Given the Circumstances.**

38.      In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

39.      The DIP Facility was negotiated in good faith and at arm's-length between the Debtors and the DIP Lenders, culminating in an agreement designed to permit the continued operation of the Debtors' business in the ordinary course.

40.      Moreover, approval of the DIP Facility is especially important here where the Debtors' inability to access financing and thereby generate revenues to adequately support their

business at this critical juncture would severely jeopardize the inventory of plants that comprises the vast majority of the Debtors' value and the Prepetition Collateral. Approval and implementation of the DIP Facility, in contrast, will enable continued functioning of the Debtors' operations in the ordinary course of business and permit the Debtors to water and care for the inventory of plants in its possession thereby enhancing the value of the Prepetition Collateral. *See, e.g., Bray v. Shenandoah Fed. Sav. And Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender, particularly when "time is of the essence to preserve a vulnerable seasonal enterprise"); *In re Western Pacific Airlines, Inc.*, 223 B.R. 567 (Bankr. D. Colo. 1997) (authorizing postpetition financing to preserve value of aircraft leaseholds where to hold otherwise would result in the elimination of their value and the "immediate collapse of the Debtor as a going concern").

**D.      Entry Into the DIP Facility Reflects the Debtors' Sound Business Judgment.**

41.      A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g., Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

DOCS_DE:164441.4

42.     Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money. *See, e.g., Group of Inst. Investors v. Chicago, Mil., St. P. & Pac.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to the business judgment of the debtor); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court"). Further, one court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

43.     Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious, *In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); *see also Trans World Airlines, Inc.*, 163 B.R. at 974 (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor), and generally will not second-guess a debtor in possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley,* 14 B.R. at 513-14 (footnotes omitted).

44.     As described above, the Debtors have exercised sound business judgment in determining the appropriateness of the DIP Facility and submit they have satisfied the legal

prerequisites to incur debt on the terms and conditions set forth in the DIP Facility. The Debtors

believe that the DIP Facility contains terms that are the best available under the circumstances.

45.     The funds provided by the DIP Facility are essential to enable the Debtors to

avoid irreparable harm to the Debtors' assets and business.

46.     Accordingly, pursuant to sections 364(c) and (d)(1) of the Bankruptcy Code, the

Debtors respectfully submit that they should be granted authority to enter into the DIP Facility

and obtain funds from the DIP Lenders on the secured and administrative superpriority basis

described herein.

## II.      The Debtors' Request To Use Cash Collateral and the Proposed Adequate Protection Being Provided to Prepetition Lenders is Appropriate and Meets the Required Standard.

47.     In exchange for the Debtors' use of the Prepetition Collateral, including Cash

Collateral, and their priming of the Prepetition Liens, the Debtors propose to provide the Prepetition

Lenders with adequate protection in accordance with sections 364(d) and 361 of the Bankruptcy

Code. To that end, the Debtors request that the Court approve and authorize the Debtors' proposed

adequate protection of the Prepetition Lenders' interest in each of their respective Prepetition

Collateral in respect of any diminution in value resulting from (i) use of the Cash Collateral, (ii) the

use, sale, or lease of the Prepetition Collateral, (iii) the imposition of the automatic stay pursuant to

section 362 of the Bankruptcy Code, and (iv) the implementation of the DIP Facility and the

priming of the Prepetition Liens.

48.     The Interim Order provides adequate protection of the interests of the Prepetition

Lenders in the Prepetition Collateral against any diminution in value of such interests resulting from

the priming of their liens by the DIP Facility, in the form of valid, binding, enforceable, non-avoidable and automatically perfected replacement security liens. The Debtors will also grant the Prepetition Lenders current interest at the default rate, payment of certain fees and expenses set forth in the Interim Order, and an allowed superpriority administrative expense claim in these Chapter 11 Cases, to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code. Further, in the event any party holding a lien or security interest in DIP Collateral junior and/or subordinate to the Postpetition Liens in such Collateral receives or is paid the proceeds of such DIP Collateral or receives any other payment with respect thereto from any other source, prior to indefeasible payment in full in cash and the complete satisfaction of all DIP Obligations under the DIP Loan Documents and termination of the commitment in accordance with the DIP Loan Documents, such junior or subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such DIP Collateral in trust for the DIP Lenders and shall immediately turnover such proceeds for application to the DIP Obligations under the DIP Loan Documents in accordance with the DIP Loan Documents and the Interim Order until all DIP Obligations are indefeasibly paid in full in cash.

49.     The Debtors believe that such adequate protection is fair and reasonable. In reliance upon such adequate protection, the Prepetition Lenders have consented, on an interim basis as described above and subject to the reservation of rights contained in paragraph 46 of the Interim Order, to the priming of their Prepetition Liens. The consent of the Prepetition Lenders permits the Debtors to avoid potentially time consuming and unpredictable priming litigation. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (requiring a substantial evidentiary

foundation to be laid in connection with the debtors' request to grant a priming lien and finding there was not adequate protection of a prepetition lenders' interest in collateral where there was a projected increase in the value of such collateral). The Prepetition Lenders' consent to the priming of their Prepetition Liens thus permits the Debtors to save considerable resources, not to mention avoid a delay, in obtaining postpetition financing. And, importantly, the proposed adequate protection shall only be provided to the extent there is a diminution in value to the Prepetition Lenders' interest in the Prepetition Collateral. Accordingly, based upon the foregoing, the Debtors respectfully request that the Court authorize the Debtors to provide the above described adequate protection to the Prepetition Lenders in accordance with the terms set forth in the DIP Order and DIP Facility.

### III. The Debtors are Authorized to Use Cash Collateral.

50.     In addition to the need for the DIP Facility, the Debtors have a critical need for the immediate use of Cash Collateral. The Debtors require use of the Cash Collateral to pay present operating expenses including payroll and to pay vendors to ensure a continued supply of services and materials essential to the Debtors' continued viability. If unable to use the Cash Collateral pending the Final Hearing, the Debtors will be unable to operate their business.

51.     Under section 363(c)(2) of the Bankruptcy Code, the Debtors may not use Cash Collateral without the consent of the Prepetition Lenders or authority granted by the Court. The Prepetition Lenders have consented, on an interim basis as described above and subject to the reservation of rights contained in paragraph 46 of the Interim Order, to the continued use of Cash Collateral and therefore the Debtors have satisfied the requisite standards.

**IV.    Provisions To Be Highlighted Pursuant to Local Rule 4001-2.**

52.    Local Rule 4001-2 requires the Debtors to affirmatively advise the Court of any deviations from certain proscribed provisions to be included in financing and cash collateral orders.   The Interim Order deviates from Local Rule 4001-2 by virtue of the following provisions:

(i)    subject to the entry of the Final Order, granting liens and superpriority claims in favor of the DIP Lenders on proceeds of avoidance actions (paragraphs 8-9 of the Interim Order);

(ii)    granting a partial roll-up for each dollar of the Debtors' postpetition cash collections (which will be expended either as Cash Collateral or applied to the DIP Obligations as provided in the Interim Order and any Final Order), such that an equivalent amount of Prepetition Indebtedness owed under the ABL Credit Facility shall be deemed to have been repaid and re-borrowed on a postpetition basis (subject and subordinate to the DIP Obligations and the Postpetition Liens);

(iii)    granting the DIP Agent and the DIP Lenders a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code and a waiver of the provisions of section 506(c) of the Bankruptcy Code (paragraph 15); and

(iv)    providing disparate treatment for the professionals retained by a creditors' committee with respect to a professional fee carve-out by budgeting lower amounts for such professionals than for the Debtors' professionals (page 2 of the Budget to be submitted).

53. The Debtors submit that the DIP Facility is the best available under the circumstances and that entry into the DIP Facility is in the best interest of the Debtors and their estates. Substantially all of the Debtors' assets are encumbered by the liens and security interest securing the Debtors' obligation under the Prepetition Credit Agreements. The Debtors are confident that no other lender was willing to extend credit on a junior priority basis.

54. Courts in this district and elsewhere have supported the granting of liens on avoidance action proceeds at the final hearing. *See In re ACG Holdings, Inc.,* Case No. 08-11467 (Bankr. D. Del. July 16, 2008) (approving the granting of liens on avoidance actions to postpetition lenders); *In re Tropicana Entm't, LLC,* Case No. 08-10856 (KJC) (Bankr. D. Del. June 5, 2008) (approving the granting of liens on avoidance actions to postpetition lenders); *In re Silver Cinemas Int'l, Inc.,* No. 00-1978 (Bankr. D. Del. Aug. 11, 2000) (same); *In re Trans World Airlines,* 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving the granting of liens on avoidance actions to postpetition lenders); *In re Movie Gallery, Inc.,* No. 07-33849 (Bankr. E.D. Va. Nov. 16, 2007) (secured lenders' collateral includes proceeds and property that is the subject of successful avoidance actions); *In re NTELOS Inc.,* No. 03-32094 (DOT) (Bankr. E.D. Va. Mar. 24, 2003) (same); *In re Enron Corp.,* No. 01-16034 (Bankr. S.D.N.Y. July 2, 2002) (granting secured lenders liens on avoidance action proceeds); *In re AMF Bowling Worldwide, Inc.,* No. 01-61119 (Bankr. E.D. Va. Aug. 8, 2001) (secured lenders' collateral includes avoidance actions and proceeds); *In re Ellingsen MacLean Oil Co.,* 98 B.R. 284, 291-92 (Bankr. W.D. Mich. 1989). Accordingly, the Debtors believe that granting liens on the Avoidance Actions subject to entry of the Final Order is appropriate.

DOCS_DE:164441.4

55. Finally, in light of the DIP Agent's and the DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out and to finance the Debtors' Chapter 11 Cases, the section 506(c) and 552(b) waivers are justified.

**V.    Modification of the Automatic Stay is Warranted.**

56. The proposed Interim Order provides limited circumstances under which the automatic stay could be vacated without further order of the Court. Specifically, the proposed Interim Order provides that upon the occurrence of an Event of Default or upon a default of the terms of the Interim Order, but subject to five (5) business days prior written notice (the "Remedies Notice Period"), the automatic stay is modified or vacated to allow for the termination of the commitments under the DIP Demand Note, declare all DIP Obligations immediate due and payable and/or take any actions necessary to preserve or safeguard the DIP Collateral. In addition, subject to the Remedies Notice Period, the automatic stay is modified to allow the DIP Lenders and the DIP Agent to foreclose or otherwise enforce their security interests in or liens on any or all of the DIP Collateral.

57. In addition, pursuant to the proposed Interim Order, the automatic stay would be vacated without further order of the Court in circumstances unrelated to an Event of Default or a default under the Interim Order to allow the DIP Agent and DIP Lenders (i) to require all cash, checks or other collections or proceeds from DIP Collateral received by any of the Debtors to be deposited in accordance with the requirements of the DIP Demand Note, and to apply any amounts so deposited and other amounts paid to or received by the DIP Agent and the DIP Lenders, under the DIP Demand Note in accordance with any requirements of the DIP Demand

Note, (ii) the right to setoff funds in accounts maintained by the Debtors with any of the DIP Lenders or the DIP Agents to repay the DIP Obligations, (iii) the right to file or record any financing statements, mortgages or other instruments or other documents to evidence the security interests in and liens upon the DIP Collateral, (iv) the right to charge and collect any interest, fees, costs and other expenses accruing at any time under the DIP Demand Note as provided therein, (v) the right to give the Debtors any notice provided for in any of the DIP Demand Note or the Interim Order, and (vi) the right to charge interest at the default rate.

58.     The Debtors submit that this limited stay modification is in the best interests of the Debtors and their estates and is the best attainable under the circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated by the DIP Facility and the proposed DIP Orders.

## VI.     Partial Roll-Up to the Extent of Cash Collateral Use is Appropriate and Should be Approved

59.     As noted above, the DIP Facility contemplates that, for each dollar of the Debtors' postpetition cash collections, including cash collections during the term of the Interim Order (which will be expended either as Cash Collateral or applied to the DIP Obligations as provided in the Interim Order and any Final Order), an equivalent amount of Prepetition Indebtedness owed under the ABL Credit Facility shall be deemed to have been repaid and re-borrowed on a postpetition basis, so that such amount shall be deemed to be postpetition indebtedness advanced pursuant to sections 364(c)(1), 364(c)(2) and 364(c)(3), secured by the DIP Collateral but subject and subordinate to the DIP Obligations and the Postpetition Liens. Notwithstanding the foregoing partial Roll-Up, in no event shall the aggregate amount of the

Roll Up exceed the lesser of (i) actual collections received by the Debtors on account of ABL Primary Collateral in existence as of the Petition Date, including proceeds thereof, and (ii) the allowed amount of the secured claim of the ABL Lenders as determined in accordance with section 506(b) of the Bankruptcy Code. Notwithstanding anything to the contrary set forth herein or the Interim Order, the indebtedness evidenced by the Roll Up shall in all respects be and remain subject to the terms of the Intercreditor Agreement as if no such roll up had occurred. The Debtors expect to utilize approximately $3.5 million of cash receipts during the term of the Interim Order, which would be subject to the Roll-Up.

60. The Debtors believe that the proposed Roll-Up Loan is warranted for several reasons:

- The terms of the Roll-Up are limited to cash collateral actually expended and that otherwise would be available to the ABL Lenders, absent the "priming" loans provided under the DIP Facility;

- Because the Roll-Up is subordinate to the DIP Facility and does not require the Debtors to pay any cash interest or other obligations on account of the Roll-Up, it will not affect the Debtors' cash flow;

- A statutory committee will have the required opportunity to review the validity of the prepetition liens;

- Approval of the Roll-Up pursuant to the Interim Order is a condition to the DIP Loan and was a critical element in procuring the DIP Lenders' agreement to the terms of the DIP Facility Documents.

**VII. Interim Approval of $5,000,000 in Borrowings Should be Approved.**

61. It is essential that the Debtors immediately stabilize their operations and cash flow, which will maximize the potential for a going-concern sale of their business. Accordingly,

the Debtors are seeking interim approval to access $5,000,000 of the DIP Facility to meet their working capital needs, including making payments to employees, suppliers, and various governmental authorities.

62.     The Debtors submit that this Court also should also grant the Debtors' request for immediate authority to use the Cash Collateral to prevent immediate and irreparable harm to the Debtors' estates pending a final hearing on the Motion pursuant to Bankruptcy Rule 4001(c). At this time, the Debtors expect to use $3,500,000 of Cash Collateral during the interim period. Without use of the Cash Collateral, the Debtors' trade creditors will cease to provide goods and services to the Debtors on credit, and the Debtors will not be able to pay their payroll and other direct operating expenses or obtain goods and services needed to run their business in the ordinary course and in a manner that will avoid immediate and irreparable harm to their estates. The ability of the Debtors to finance their operations and the availability to the Debtors of sufficient working capital and liquidity through the use of the Cash Collateral is vital to the confidence of the Debtors' employees, major suppliers, and to the preservation and maintenance of the going-concern values and other values of the Debtors' estates. In the absence of immediate postpetition financing and use of Cash Collateral, the value of the Debtors' inventory - consisting primarily of perishable live plants - and the continued operation of the Debtors' businesses would not be possible and serious and irreparable harm to the Debtors and their estates would occur. The Debtors, therefore, seek authority to use the Cash Collateral.

63.     Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to
> obtain credit no earlier than 15 days after service of the motion. If
> the motion so requests, the court may conduct a hearing before
> such 15 day period expires, but the court may authorize the
> obtaining of credit only to the extent necessary to avoid immediate
> and irreparable harm to the estate pending a final hearing.

64.     In examining requests for interim relief under this rule, courts apply the same

business judgment standard applicable to other business decisions. *See, e.g., Ames Dep't Stores,*

115 B.R. at 36; *Simasko,* 47 B.R. at 449.  Under this standard, the Debtors' request for entry of

the DIP Orders, in the time periods and for the financing amounts requested herein, is

appropriate.  Moreover, courts in this jurisdiction have granted similar relief in other chapter 11

cases. *See e.g., In re Tropicana Entm't, LLC,* Case No. 08-10856 (Bankr. D. Del. May 7, 2008)

(allowing interim access to $20 million of the debtors total DIP facility); *In re Sharper Image*

*Corp.,* Case No. 08-10322 (Bankr. D. Del. Feb. 20, 2008) (allowing interim access to $35 million of

the debtors' $60 million DIP facility); *In re American LaFrance LLC,* Case No. 08-10178

(Bankr. D. Del. Jan. 30, 2008) (allowing interim access to $30 million of a $285 DIP facility that was

approved on a final basis); *In re Pope & Talbot, Inc.,* Case No. 07-11738 (Bankr. D. Del. Nov.

21, 2007) (allowing interim access to $68 million of the debtors' aggregate DIP facility of $89

million).

65.     The Debtors believe that, under the circumstances, the terms and conditions set

forth herein are fair and reasonable for the use of cash collateral and the approval of the proposed

adequate protection.

## Request for Final Hearing

66.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the final hearing that is as soon as practicable, but in no event later than twenty-eight days following the entry of the Interim Order, and fix the time and date prior to the final hearing for parties to file objections to the Motion.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

67.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## No Prior Request

68.     No prior motion for the relief requested herein has been made to matter.

## Notice

69.     The Debtors have provided notice of this Motion to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) the agent for the Debtors' proposed postpetition secured lenders; (c) the agents for the Debtors' prepetition secured lenders; (d) parties with liens of record on assets of the Debtors as of the Petition Date, and (e) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions. As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m). In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

DOCS_DE:164441.4

WHEREFORE, the Debtors respectfully request entry of the Interim Order, substantially in the form attached hereto as **Exhibit 1** (a) authorizing the Debtors to obtain secured postpetition financing on a superpriority administrative claim and first priority priming lien basis, (b) authorizing the Debtors' use of cash collateral, (c) granting adequate protection to the prepetition secured lenders for the priming of their existing liens, (d) setting the final hearing on the Motion, and (e) granting such other and further relief as the Court deems appropriate.

Dated: October 12, 2010     PACHULSKI STANG ZIEHL & JONES LLP


Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Joshua M. Fried (CA Bar No. 181541)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: 302-652-4100
Facsimile: 302-652-4400
email: ljones@pszjlaw.com
       dbertenthal@pszjlaw.com
       jfried@pszjlaw.com
       tcairns@pszjlaw.com

and

JONES, WALKER, WAECHTER, POITEVENT,
CARRERE & DENEGRE, L.L.P.
R. Patrick Vance (pro hac vice pending)
Elizabeth J. Futrell (pro hac vice pending)
Erica N. Beck (pro hac vice pending)
Mark A. Mintz (pro hac vice pending)
201 St. Charles Avenue, Suite 5100
New Orleans, Louisiana 70170
Telephone: 504-582-8000
Fax: 504-582-8011

[Proposed] Counsel for Debtors and Debtors in Possession

DOCS_DE:164441.4