IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CONSOLIDATED HORTICULTURE | ) | Case No. 10-13308 (CSS) |
| GROUP LLC, et al., [1] | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

Requested Deadline for Objections to Bidding Procedures: December 10, 2010 at 4:00 p.m. (ET)
Requested Hearing Date on Bidding Procedures Motion: December 14, 2010 at 3:00 p.m. (ET)

### DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS, (B) SCHEDULING AN AUCTION AND HEARING TO CONSIDER THE SALE AND APPROVE THE FORM AND MANNER OF NOTICE RELATED THERETO; (C) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; AND (D) GRANTING OTHER RELATED RELIEF

The above-captioned debtors and debtors in possession (the "Debtors") hereby move this

Court for the entry of an order: (a) approving certain bidding procedures in connection with the

sale of the Debtors' assets; (b) scheduling an auction and hearing to consider the sale of and

approve the form and manner of notices related thereto; (c) establishing procedures for the

assumption and assignment of certain contacts that will be assumed and assigned as part of the

sale; and (d) granting related relief (this "Motion"). The proposed bidding procedures (the

"Bidding Procedures") are attached hereto as Exhibit A.

The Debtors do not currently have a "stalking horse" bidder for their assets. The Bidding

Procedures contemplate that a buyer for the Debtors' assets will be identified at a later date.

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of each Debtors' federal tax identification numbers are: Consolidated Horticulture Group LLC (2698); New Hines Parent Company LLC (9355); Hines Nurseries LLC (2567). The location of the Debtors' headquarters and the service address for the Debtors is: 12621 Jeffrey Road, Irvine, California 92620.

There is significant urgency to the relief requested by this Motion given that the Debtors' existing debtor-in-possession financing facility (the "DIP Facility") with Black Diamond Commercial Finance, L.L.C., as administrative agent (the "DIP Agent"), presently matures on December 15, 2010. Further extensions of the DIP Facility will require the Debtors to move forward with the sale process contemplated hereby.

In support of this Motion, the Debtors respectfully state as follows:

## Jurisdiction and Venue

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief sought herein are sections 105, 363, 365, 503, 1107 and 1108 of chapter 11 of title 11, United States Code (the "Bankruptcy Code"), Rules 2002(a)(2), 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b), 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Background

4.      On October 12, 2010 (the "Petition Date"), each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code.

5.     The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.     On October 14, 2010, this Court entered an order of joint administration pursuant to Rule 1015(b) of the Bankruptcy Rules that provided for the joint administration of these cases and for consolidation for procedural purposes only [D.I. 35].

7.     On October 26, 2010, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I. 66].

8.     The Debtors operate one of the largest commercial nursery operations in North America, producing and distributing one of the broadest assortments of ornamental shrubs, color plants and container-grown plants in the industry. The Debtors sell their green goods to more than 1,180 retail and commercial customers, representing more than 6,670 outlets throughout the United States, including premium local and regional garden centers, as well as leading national home centers and retailers, such as The Home Depot, Lowe's and Wal-Mart.

9.     As of the Petition Date, the Debtors employed approximately 900 employees. The Debtors' employee base fluctuates seasonally from a low of approximately 850 to a high of approximately 1,200 employees during the activity-intensive preparation and selling season from February to June (excluding temporary workers). None of the Debtors' employees are represented by a labor union. Hourly, salaried and contract labor comprise nearly 41% of the Debtors' production costs as of July 31, 2010.

15341-001\DOCS_DE:165935.1

10.     The Debtors produce approximately 5,100 varieties of ornamental shrubs, color plants, and container-grown plants grown primarily for outdoor use, most of which are sold under the Hines Nurseries trade name.  The Debtors operate eight nurseries located in Arizona, California, Oregon and Texas.

11.     In 2009, the Debtors recorded net sales of approximately $123.5 million. In addition, for 2009, the Debtors reported approximately $173.8 million in total assets and approximately $64.4 million in total liabilities, including secured obligations under the Debtors' prepetition secured term and revolving credit facilities.

12.     The Debtors had to file for chapter 11 relief due to significant declines in revenue.  The Debtors' decline in revenue stems primarily from, among other things: (a) continued weak consumer demand for products in the Debtors' industry; (b) anemic homebuilding activity; (c) continued pricing pressure from certain of the Debtors' largest customers; (d) loss of revenues from business strategy changes from one of the Debtors' largest customers; and (e) inventory imbalances that lead to shortages of critical crops.

### The Debtors' Chapter 11 Cases

13.     On October 12, 2010, the Debtors filed a Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Granting Liens and Superpriority Claims, (C) Authorizing Use of Cash Collateral, (D) Granting Adequate Protection to Prepetition Secured Parties, and (E) Scheduling a Final Hearing (the "DIP Motion") [D.I. 15], seeking authorization to, among other things, obtain secured postpetition financing in the amount of up to $20,000,000 on a superpriority, "priming" basis (i.e., the "DIP Facility"), of

4

which the sum of $5,000,000 would be available on an interim basis pursuant to an Interim Order

and the terms and conditions of that certain Revolving Loan Promissory Note (the "DIP Note")

with the DIP Agent and the other lenders party thereto. Funding under the DIP Note has been

increased to $10,500,000 under two subsequent Interim Orders of the Court. Presently, the DIP

Facility is set to mature on December 15, 2010.

   14.  The DIP Facility is senior to, and "primes," certain existing prepetition

secured indebtedness of the Debtors, including obligations under: (a) that certain Loan and

Security Agreement, dated as of January 9, 2009 (as amended, restated, supplemented or

otherwise modified from time to time, the "ABL Credit Facility"), by and among Hines, as

borrower, certain financial institutions, as lenders, and Bank of America, N.A., individually as a

lender and as agent (as the agent, the "ABL Agent"); (b) that certain Term Loan and Security

Agreement, dated January 9, 2009 (as amended, restated, supplemented or otherwise modified

from time to time, the "Term Loan Credit Facility"), by and among Hines, as borrower, certain

financial institutions, as lenders, and Black Diamond Commercial Finance, L.L.C., as agent for

the Term Loan Lenders (the "Term Loan Agent"); and (c) that certain Subordinated Loan and

Security Agreement, also dated January 9, 2009 (as amended, restated, supplemented or

otherwise modified from time to time, the "Sub Loan Credit Facility"), by and among Hines, as

borrower, certain financial institutions, as lenders, and Black Diamond Commercial Finance

L.L.C., as agent for the Sub Loan Lenders (the "Sub Loan Agent").

15341-001\DOCS_DE:165935.1

15. Consent from the ABL Agent was obtained for purposes of entry of the three Interim Orders in these cases to date. However, the ABL Agent has yet to consent to a further extension of the DIP Facility on a priming basis beyond December 15, 2010.

16. Despite extensive negotiations among the parties, the DIP Agent and the ABL Agent have been unable to agree on the terms of a final DIP Facility that would provide the Debtors with adequate liquidity to continue their evaluation of strategic alternatives, including (without limitation) pursuit of a stand-alone plan of reorganization. Absent agreement of the parties or the consent of the ABL Agent, the Debtors have no alternative but to immediately pursue a sale of all or substantially all of their assets pursuant to section 363 of the Bankruptcy Code.

17. Indeed, absent a sale, the Debtors would have to immediately terminate their employees and begin the wholesale liquidation of their inventory to the detriment of their estates and creditors. A sale offers the Debtors' creditors the best option presently available to maximize value and preserve employee jobs.

18. The Debtors are currently in the process of retaining an investment banker in order to assist the Debtors in their marketing effort. The Debtors believe that the Bidding Procedures proposed hereby will enable these estates to efficiently consummate a sale of the Debtors' assets at an auction to the highest or best bidder. The Debtors will market their assets pending the outcome of the auction. The Debtors believe that such marketing of their assets over the period contemplated by the Bidding Procedures will result in the highest or best price for the estate assets under the circumstances.

15341-001\DOCS_DE:165935.1

## Relief Requested

19.     Pursuant to this Motion, the Debtors request that the Court, among other things:

(a.)    approve the proposed Bidding Procedures;

(b.)    approve the procedures set forth herein for the assumption and assignment of certain executory contracts and unexpired leases (the "Assumed Contracts") in connection with the sale;

(c.)    establish a date for holding the auction (the "Auction") and approve certain procedures in connection therewith;

(d.)    schedule the hearing (the "Sale Hearing") to approve any sale transaction(s) to the highest or best bidder for the Assets (the "Successful Bidder") and establish deadlines for objections and responses to the relief requested in the sale motion filed concurrently herewith (the "Sale Motion"); and

(e.)    approve the form and manner of notice to be served upon certain parties, including:  (i) the form of notice, substantially in the form attached hereto as Exhibit B, to be served on the Sale and Bidding Procedures Notice Parties (as defined below); (ii) the form of notice, substantially in the form attached hereto as Exhibit C, to be served on all known creditors of the Debtors (the "Creditor Notice"); and (iii) the form of notice to parties holding Assumed Contracts in conjunction with the proposed sale, in substantially the form attached hereto as Exhibit D (the "Cure Notice").

15341-001\DOCS_DE:165935.1

## Sale Hearing

20.     The Debtors request that the Court schedule the Sale Hearing on or about **January 21, 2011**, and that objections, if any, to the Sale Motion be filed one week prior to the Sale Hearing no later than **4:00 p.m. (Eastern time) on January 14, 2011**.

## Proposed Bidding Procedures

21.     The Bidding Procedures are attached hereto as <u>Exhibit A</u>.  The Debtors are selling all or substantially all of their assets, which the Debtors reserve the right to sell in a single transaction to a single purchaser or in parts to several purchasers.  The key provisions of the Bidding Procedures to be employed with respect to the proposed sale include the following:[2]

(a)     <u>Provisions Governing Participation Requirements</u>.  Unless otherwise ordered by the Bankruptcy Court, or as otherwise determined by the Sellers (in consultation with the Creditors' Committee, the DIP Agent and the Prepetition Agents, together the "Consultation Parties"), in order to participate in the Bidding Process, prior to the Bid Deadline (as defined below), each person who wishes to participate in the Bidding Process (a "Potential Bidder") must deliver to the Debtors (who shall promptly distribute copies to the Consultation Parties), the following:

> (i)     an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers, and which shall inure to the benefit of any purchaser of Assets.  In the event that the Potential Bidder has already entered into a confidentiality agreement with the Sellers, it must provide a statement to the Sellers (i) agreeing that its obligations under such agreement shall inure to the benefit of any purchaser of the Assets; and (ii) waiving any of its rights under such confidentiality agreement that are in conflict with the Bidding Procedures or that would otherwise prohibit disclosures regarding the Potential Bidder, or any Transactions it may propose;

> (ii)     current audited financial statements and latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current audited financial statements and latest unaudited

---

[2]  Capitalized terms used in this Section but not defined herein have the meanings ascribed to them in the Bidding Procedures.  To the extent there are inconsistencies between any summary description of the Bidding Procedures contained herein and the Bidding Procedures attached hereto as <u>Exhibit A</u>, the terms of the Bidding Procedures shall control.

financial statements of the equity holders of the Potential Bidder or any other party who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Sellers and the Consultation Parties and their respective financial advisors, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Transactions; and

(iii)     a non-binding letter of intent demonstrating to the Sellers' satisfaction (following consultation with the Consultation Parties), a bona fide interest in purchasing the Assets from the Sellers including: (i) the purchase price (including liabilities to be assumed by the Potential Bidder); (ii) the Assets expected to be included and/or excluded; (iii) the structure and financing of the Transactions (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the Transactions, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder (save in jurisdictions where employees transfer by operation of law), and any proposed measures associated with the continued employment of all employees who will become employees of the Qualified Bidder; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Purchase Agreement.

A Potential Bidder (i) that has delivered the documents described above to the Sellers, (ii) whose financial information and credit quality support or enhancement demonstrate in the Sellers' judgment, after consultation with their counsel and financial advisors and the Consultation Parties, the financial capability of the Potential Bidder to consummate the Transactions, (iii) that has executed a confidentiality agreement, as described above, and (iv) that the Sellers determine in their reasonable business judgment, after consultation with their counsel and financial advisors and the Consultation Parties, is likely (based on availability of financing, experience and other considerations) to be able to consummate the Transactions, will be deemed a "Qualified Bidder".

Subject to the satisfaction of the applicable requirements set forth below for submission of a Qualified Bid (as defined below), each of the DIP Agent, the ABL Agent, the Term Loan Agent, and the Sub Loan Agent, for itself and on behalf of the DIP Lenders, the ABL Lenders, the Term Loan Lenders, and the Sub Loan Lenders, respectively, shall be deemed to be a Qualified Bidder for all purposes in connection with these Bidding Procedures and, pursuant to section 363(k) of the Bankruptcy Code, shall be permitted, but not compelled, to credit bid as to the Assets constituting such bidder's collateral up to the full amount of such bidder's secured claims (subject to any existing intercreditor agreements) against the Purchase Price at the Auction (each as defined below).

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Consultation Parties, and will notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder. At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the

Qualified Bidder to begin or continue to conduct due diligence with respect to the Assets as provided in the following paragraph.

(b)  The Bid Deadline.  A Qualified Bidder that desires to make a bid will deliver written copies by hand delivery, overnight courier, mail, facsimile and/or email of its bid to counsel to the Debtors: Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19801, Facsimile: (302) 652-4400 (Attention: Laura Davis Jones and David M. Bertenthal), so as to be received not later than **January 18, 2010 at 12:00 p.m. (ET)** (as may be extended as set out below, the "Bid Deadline").

The Debtors shall, no later than 12:00 p.m. Noon on the day following receipt, promptly distribute copies of any bids to the following parties: (i) counsel to the Creditors' Committee: Lowenstein Sandler PC, 65 Livingston Avenue, Roseland, New Jersey 07068, Facsimile: (973) 597-2465 (Attention: Sharon L. Levine and Wojciech F. Jung) and Blank Rome LLP, 1201 Market Street, Suite 800, Wilmington, Delaware 19801, Facsimile: (302) 425-6464 (Attention: Alan Michael Root and David W. Carickhoff); (ii) counsel to the DIP Agent, the Term Loan Agent and the Sub Loan Agent: Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, Fax: (212) 593-5955 (Attention: Adam C. Harris and Kathryn L. Turner) and Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, Delaware 19801, Facsimile: (302) 467-4450 (Attention: Richard S. Cobb and Landon Ellis); and (iii) counsel to the ABL Agent: Latham & Watkins LLP, 233 S. Wacker Drive, Suite 5800, Chicago, Illinois 60606, Facsimile: (312) 876-9767 (Attention: J. Douglas Bacon and Alice D. Burke) and Edwards Angell Palmer & Dodge LLP, 919 N. Market Street, Suite 1500, Wilmington, Delaware 19801, Facsimile: (888) 325-9533 (Attention: Stuart M. Brown and Michelle E. Marino).  The Sellers, after consultation with the Consultation Parties, may extend the Bid Deadline once or successively, but they are not obligated to do so.

(c)  Provisions Governing Qualified Bids.  A bid submitted will be considered a Qualified Bid if the bid is submitted by a Qualified Bidder, pursuant to the previous paragraph and complies with all of the following (a "Qualified Bid"):

(i)  it includes a letter stating that the bidder's offer is irrevocable until the approval of the Successful Bidder and, if applicable, the Alternate Bidder (as defined below), at the Sale Hearing (as defined below) underlined provided that if such bidder is selected as the Successful Bidder or the Alternate Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the Sale to the Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful Bidder only, 30 days after the Sale Hearing, subject to further extensions as may be agreed to under the applicable purchase agreements and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below);

(ii)  it includes a duly authorized and executed purchase agreement, including the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, and the other ancillary agreements as described in such purchase agreement and such additional ancillary agreements as may be required by the bidder with all exhibits and schedules thereto (or term sheets that describe

the material terms and provisions of such agreements), as well as copies of such materials marked to show those amendments and modifications to the Model Purchase Agreement ("Marked Agreements") and such ancillary agreements (the "Marked Ancillary Agreements") (in each case to the extent applicable) and the proposed orders to approve the Sale by the Bankruptcy Court;

(iii)     it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Creditors' Committee, the DIP Agent and the Prepetition Agents, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreements;

(iv)     it is not conditioned on (i) the completion or outcome of unperformed due diligence by the bidder and/or (ii) obtaining financing;

(v)     it fully discloses the identity of each entity that will be bidding for the Assets or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation;

(vi)     it includes an acknowledgment and representation that the bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Marked Purchase Agreements (or identifies with particularity which of such contracts and leases the bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases the bidder wishes to assume), contains full details of the bidder's proposal for the treatment of related cure costs; and it identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(vii)     it includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreements or the Marked Ancillary Agreements; and (iv) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(viii)     it provides a sufficient amount of cash as a component of the purchase price to (i) repay all obligations owed by the Debtors under the DIP Note, (ii) pay all accrued and unpaid professional fees, plus the sum of $250,000 for post-closing professional fees (to the extent provided in the budget and the Interim Order (as defined in the DIP Note) to be utilized in accordance with the professional fee carve-out), and (iii) to the extent not assumed by the Successful Bidder, pay all postpetition accrued and

unpaid ordinary course obligations of the Sellers to the extent provided in the budget, in each case calculated as of the closing;

(ix)     it includes evidence, in form and substance reasonably satisfactory to Sellers, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

(x)     it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Sellers), certified check or such other form acceptable to the Sellers, payable to the order of the Sellers (or such other party as the Sellers may determine) in U.S. Currency in an amount equal to 10% of the Purchase Price (the "Good Faith Deposit") to be dealt with as provided for under "Good Faith Deposit" below;[3]

(xi)     it includes evidence of the Potential Bidder's ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Potential Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Sellers and assigned or subleased to the Potential Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

(xii)     it contains other information reasonably requested by the Sellers in consultation with the Consultation Parties; and

(xiii)     it is received by the Bid Deadline.

In advance of the Auction (as defined below), the Sellers shall notify all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids (and, with respect to each Qualified Bidder that submitted a bid, whether such Qualified Bidder's bid constitutes a Qualified Bid), and shall provide any Qualified Bidder with a copy of any other Qualified Bid received by the Sellers.

In the case of a credit bid submitted by either of the DIP Agent, the ABL Agent, the Term Loan Agent, or the Sub Loan Agent, for itself and on behalf of the DIP Lenders, the ABL Lenders, the Term Loan Lenders, or the Sub Loan Lenders, respectively, such bid shall only be construed as a Qualified Bid if such credit bidder has complied with subsections (i), (ii), (iv), (v), (vi), (vii), (viii) (other than clause (i) thereof in the case of a credit bid by the DIP Agent), (xi), (xii) and (xiii) immediately above, and in addition has provided a cash component sufficient to pay in full any indebtedness secured by senior liens on the Assets to be acquired.

The Sellers may determine, in their reasonable business judgment, after consultation with the Consultation Parties, to waive any non-material failure of a Qualified Bidder to comply with one or more of the requirements specified herein and deem such bid to be a Qualified Bid.

---

[3]  In the event of a credit bid, neither the DIP Agent, the ABL Agent, the Term Loan Agent nor the Sub Loan Agent shall be required to post a Good Faith Deposit.

(d)    Aggregate Bids.  The Sellers, after consultation with the Consultation Parties,  may aggregate separate bids from unaffiliated persons to create one "Qualified Bid" from a "Qualified Bidder"; provided that all bidders shall remain subject to the provisions of 11 U.S.C. § 363(n) regarding collusive bidding.  For the avoidance of doubt, the Sellers may consider bids on portions of the Assets which taken together provide a higher or better return to the Sellers' estates than a single bid for all or substantially all of the Assets.

(e)    Provisions Governing Evaluation of Bids.  A Qualified Bid will be valued in the Sellers' discretion, after consultation with their advisors and the Consultation Parties, based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder, including any assumed pension liabilities) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such Transactions, the proposed revisions to the Model Purchase Agreement, the effect of the Transactions on the value of the ongoing businesses of the Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed and certainty of closing, and value of the Transactions (including any regulatory approvals required to close the Transactions), the assets included or excluded from the bid, the estimated number of employees of the Sellers to be offered post-closing employment by the Qualified Bidder and any proposed measures associated with their continued employment, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transactions, each as determined by the Sellers, in consultation with their advisors and the Consultation Parties.

(f)    Provisions Governing the Auction.  If the Sellers receive more than one Qualified Bid, the Sellers shall conduct an auction (the "Auction") of the Assets, which shall be transcribed or recorded on video to the extent required under Delaware local practice, at **10:00 a.m. (ET) on January 20, 2011**, at the offices of Pachulski Stang Ziehl & Jones LLP, located at 919 North Market Street, 17th Floor, Wilmington, Delaware 19801, or such other location as shall be timely communicated to all entities entitled to attend the Auction, which Auction may be cancelled or adjourned in accordance with these Bidding Procedures.  The Auction shall run in accordance with the following procedures:

       (i)     Only the Sellers and the Consultation Parties (and the advisors to each of the foregoing and members of the Creditors' Committee), and any Qualified Bidder that has timely submitted a Qualified Bid, shall be permitted to attend the Auction and only the Qualified Bidders will be entitled to make any subsequent bids at the Auction.

       (ii)    Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the proposed Transactions.

       (iii)   At least one (1) Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the approval of the Successful Bidder

13

at the Sale Hearing (as defined below) and (ii) if such bidder is selected as an Alternate Bidder (as defined below), the Alternate Bid Expiration Date. At or prior to the Auction, the Sellers will identify to all Qualified Bidders who have informed the Sellers of their intent to participate in the Auction, the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the Consultation Parties, is the highest or otherwise best offer (the "Starting Bid").

(iv)     All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attend the Auction in person.

(v)     The Sellers, after consultation with their counsel and financial advisors and the Consultation Parties, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court, and (ii) disclosed and made applicable to each Qualified Bidder at the Auction.

(vi)     Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Sellers determine, in consultation with their advisors and the Consultation Parties that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each incremental bid at the Auction shall provide net value to the estate of at least $250,000 over the Starting Bid or the Leading Bid, as the case may be, provided that the Sellers, in consultation with the Consultation Parties, shall retain the right to modify the increment requirements up or down at the Auction. After the first round of bidding and between each subsequent round of bidding, in each instance after consultation with the Consultation Parties, the Sellers shall announce the bid or combination of bids (and the value of such bid(s)) that they believe to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.

(g)     Provisions Governing the Selection of Successful Bid. Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors and the Consultation Parties, will (a) review each Qualified Bid and evaluate each Qualified Bid (as the same may have been amended or modified at the Auction) as set forth in the section titled "Evaluation Of Competing Bids"

herein, (b) identify the highest or otherwise best offer or offers for the Assets received at the Auction (one or more such bids, collectively the "Successful Bid" and the bidder(s) making such bid, collectively, the "Successful Bidder") and (c) communicate to the Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder, if any, and the details of the Successful Bid and Alternate Bid, if any. The determination of the Successful Bid and Alternate Bid, after consultation with the Consultation Parties, at the conclusion of the Auction, shall be final subject to approval by the Bankruptcy Court.

The Sellers will sell the Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described herein, the Alternate Bidder) upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing.

If the Debtors receive only one Qualified Bid, that bid will be deemed the Successful Bid and the Sellers after consultation with the Consultation Parties may proceed immediately to have that Successful Bid approved by the Bankruptcy Court at the Sale Hearing (as defined below) and forego the Auction.

(h)     Reservation of Rights. The Sellers, after consultation with their advisors and the Consultation Parties, and their respective advisors, (a) after each round of bidding at the Auction may determine which Qualified Bid, if any, is the highest or otherwise best offer and the value thereof, (b) may reject, at any time, any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (iii) contrary to the best interests of the Sellers, their estates, and stakeholders as determined by the Sellers in consultation with the Consultation Parties, and (c) except as otherwise specifically set forth herein with respect to instances in which the consent of the Consultation Parties is required, may modify the Bidding Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the Sale of the Assets.

## Notice of Sale Hearing

22.     As noted above, the Debtors request that the Court schedule the Sale Hearing on or about **January 21, 2011**. The Debtors propose that objections, if any, to the Sale Motion be filed one week prior to the hearing on or before **4:00 p.m. (Eastern time) on January 14, 2011**.

23.     The Debtors request that the Court approve the manner of notice of the Sale Motion, the Bidding Procedures, the Auction, and the Sale Hearing, substantially in the form attached hereto as Exhibit C (the "Sale and Bidding Procedures Notice"), which the Debtors will serve (along with the Sale Motion) on the following parties:

(a.)    the U.S. Trustee;

(b.)    counsel to the DIP Agent, the ABL Agent, the Term Loan Agent, the Sub Loan Agent and the Committee;

(c.)    all parties known to be asserting a lien on any of the Assets and who would appear as potentially holding a lien on any search conducted to determine who asserts a lien on the Debtors' assets;

(d.)    all known counterparties to the Assumed Contracts;

(e.)    all entities known to have expressed an interest in bidding on the Assets;

(f.)    the United States Attorney's office;

(g.)    all state attorney generals in states in which the Debtors do business;

(h.)    state taxing authorities in the states in which the Debtors do business and the Internal Revenue Service;

(i.)    environmental authorities in the states or smaller applicable jurisdictions in which the Debtors do business; and

(j.)    all other parties that had filed a notice of appearance and demand for service of papers in these bankruptcy cases under Bankruptcy Rule 9010(b) as of the date of entry of the Bidding Procedures Order (collectively, the "Sale and Bidding Procedures Notice Parties").

24.     Additionally, the Debtors propose to serve the Creditor Notice substantially in the form attached hereto as <u>Exhibit D</u> on all known creditors of the Debtors.

25.     The Debtors propose to serve the Sale and Bidding Procedures Notice (along with the Sale Motion) and the Creditor Notice within three (3) Business Days from the date of entry of an order granting this Motion (the "Bidding Procedures Order"), by first-class mail, postage prepaid, on the appropriate parties as described above. Both the Sale and Bidding Procedures Notice and the Creditor Notice will provide that any party that has not received a copy of the Sale Motion or the Bidding Procedures Order that wishes to obtain a copy of such documents may make such a request, in writing, to Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box, 8705, Wilmington, Delaware, 19899-8705 (Courier 19801) (Attn:  Laura Davis Jones, Esquire).

26.     The foregoing notice shall provide parties in interest approximately **thirty-five (35) days' notice** of the Sale Hearing, assuming that the Court approves the schedule proposed hereby. The Debtors submit that no other or further notice should be required.

## Sale Hearing

27.     At the Sale Hearing, the Debtors will seek Court approval of the sale of the assets to the Successful Bidder, free and clear of all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code (other than any permitted encumbrances) with all such liens, claims and interests to attach to the proceeds of the sale, except as otherwise provided, with the same validity and in the same order of priority as they attached to the assets prior to the sale, including the assumption by the Debtors and assignment to the Successful Bidder of the

Assumed Contracts pursuant to section 365 of the Bankruptcy Code. The Debtors will present additional evidence, as necessary, at the Sale Hearing and submit that the relief sought herein, including the sale and related assumption and assignment of contracts and leases, is fair, reasonable and in the best interest of these estates.

### Procedures for the Assumption and Assignment of Assumed Contracts

28.     At the closing, the Debtors intend to assume and assign to the Successful Bidder, certain executory contracts and unexpired leases to be identified in the Sale Motion and on certain schedules to the proposed purchase agreement (*i.e.*, the Assumed Contracts).[4] The list of the Assumed Contracts will be attached to the Sale Motion, provided, however, that the Successful Bidder may add to the list of Assumed Contracts (so long as the Debtors file and serve the Cure Notice on each affected contract counterparty within ten (10) calendar days before the Sale Hearing), and may remove any executory contract or lease from the list of Assumed Contracts until seven (7) calendar days prior to the closing of the sale.

29.     The Debtors propose to serve the Cure Notice, in substantially the form annexed hereto as <u>Exhibit D</u>, upon each counterparty whose agreement is on the list of Assumed Contracts no later than three (3) business days after entry of the Order approving the Bidding Procedures. The Cure Notice also will identify the amounts, if any, that the Debtors believe are owed to each counterparty to an Assumed Contract in order to cure any defaults that exist under such contract (the "Cure Costs"). The Debtors have proposed that the Cure Notice will state the

---

[4] The inclusion of any agreement in the list of Assumed Contracts does not constitute an admission by the Debtors that such agreement actually constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and the Debtors expressly reserve the right to challenge the status of any agreement included in the list of Assumed Contracts.

15341-001\DOCS_DE:165935.1

date by which any objection to the Cure Costs or the assumption and assignment of the Assumed Contract (including with respect to adequate assurance of future performance) must be filed and served, which the Debtors propose to be **January 14, 2011 at 4:00 p.m. Noon (Eastern time)**. If a contract or lease is assumed and assigned pursuant to the Court's order approving same, then unless the affected counterparty properly files and serves an objection to the Cure Costs contained in the Cure Notice, the counterparty will receive at the time of the closing (or as soon as reasonably practicable thereafter), the Cure Costs as set forth in the Cure Notice, with payment made pursuant to the terms of the purchase agreement of the Successful Bidder. If an objection is filed by a counterparty to an Assumed Contract with respect to the amount of the Cure Costs set forth in the Cure Notice, the Debtors propose that such objection must set forth a specific default under the Assumed Contract and claim a specific monetary amount that differs from the amount (if any) specified by the Debtors in the Cure Notice or, alternatively, state why the counterparty believes any Cure Costs are owing, and state the basis for any other objection to the assumption and assignment of the Assumed Contract.

30. The Successful Bidder, shall assume and be responsible for payment of any Cure Costs that may be owed to any counterparty to the Assumed Contracts in accordance with the terms of its purchase agreement. The Successful Bidder shall be responsible for satisfying any requirements regarding adequate assurances of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assumed Contracts. The Debtors propose that the Court make its determinations concerning adequate assurance of future performance under the Assumed

Contracts pursuant to section 365(b) of the Bankruptcy Code at the Sale Hearing. The Debtors further propose that Cure Costs disputed by any counterparty will be resolved by the Court at the Sale Hearing.

31.     Except to the extent otherwise provided in the agreement with the Successful Bidder(s), subject to the payment of any Cure Costs, the assignee of an Assumed Contract will not be subject to any liability to the assigned contract counterparty that accrued or arose before the closing date of the sale of the Assets and the Debtors shall be relieved of all liability accruing or arising thereafter pursuant to 11 U.S.C. § 365(k).

## Approval of the Bidding Procedures is Appropriate

32.     The Bidding Procedures described herein are customary and reasonably calculated to encourage a buyer to submit a bid and thereby maximize the value of the estates' assets.

33.     A debtor may sell, after notice and a hearing, its assets outside the ordinary course of business. 11 U.S.C. § 363. Generally, to obtain approval of a proposed sale of assets, a debtor must demonstrate that the "proffered purchase price is the highest and best offer" under the circumstances of the case. *See, e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . Debtors' duty with respect to such sales is to obtain the highest price

or greatest overall benefit possible for the estate.") (quoting *Cello Bay Co. v. Champion Int'l Corn. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

34.     The implementation of competitive bidding procedures to facilitate the sale of a debtor's assets outside of the ordinary course of a debtor's business is routinely approved by bankruptcy courts as a means of ensuring that such sale will generate the highest and best return for a debtor's estate.  The Debtors submit that the opportunity for competitive bidding embodied in the Bidding Procedures will generate the highest or otherwise best offer for their assets and therefore are designed to maximize the value of the estates' assets.

35.     As explained above, the Debtors need to move quickly to facilitate a sale for the benefit of their estates, creditors and other stakeholders.  Accordingly, the Debtors have concluded that:  (a) a prompt sale of the assets is the best way to maximize value for these estates, and (b) the proposed Bidding Procedures described herein are fair, reasonable, and appropriate and are designed to maximize recovery with respect to the sale of the assets.

36.     For the reasons set forth above, the Debtors respectfully request approval of:  (a) the Bidding Procedures; (b) the procedures set forth herein for notice to counterparties under executory contracts and leases proposed to be assumed and assigned in connection with the proposed sale, and the determination and payment of Cure Costs to the counterparties to leases or contracts to be assumed and assigned; (c) the scheduling of the Sale Hearing and other matters for which scheduling is requested herein; and (d) the related relief sought hereby.

## No Prior Request

37.     No prior request for the relief sought in this Motion has been made to this or any other court.

## Notice

38.     Concurrently with this filing, copies of this Motion will be provided to (a) the U.S. Trustee; (b) counsel to the DIP Agent, the ABL Agent, the Term Loan Agent, the Sub Loan Agent and the Committee; and (d) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure.

39.     In addition, within three (3) Business Days from the date of entry of the Bidding Procedures Order, the Debtors will serve (a) the Sale and Bidding Procedures Notice (along with the Sale Motion) on the Notice Parties, and (b) the Creditor Notice on all known creditors.

40.     The Debtors respectfully submit that such notice is sufficient, and request that the Court find that no further notice of the relief requested herein is required.

**WHEREFORE**, the Debtors respectfully request that the Court enter an order, substantially in the form filed contemporaneously with this Motion, granting the relief requested herein and such other and further relief as this Court deems appropriate.

15341-001\DOCS_DE:165935.1

Dated: December 7, 2010

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Joshua M. Fried (CA Bar No. 181541)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware  19899-8705 (Courier 19801)
Telephone:  302-652-4100
Facsimile:  302-652-4400
email:  ljones@pszjlaw.com
        dbertenthal@pszjlaw.com
        jfried@pszjlaw.com
        tcairns@pszjlaw.com

Counsel for Debtors and Debtors in Possession

15341-001\DOCS_DE:165935.1